**William Anthony BROOKS, Petitioner-Appellant,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.**

No. 83–8028.

United States Court of Appeals, Eleventh Circuit.

May 31, 1985.

As Amended on Denial of Rehearing July 23, 1985.

Opinion on Rehearing July 23, 1985.

Stephen B. Bright, George H. Kendall, Atlanta, Ga., for petitioner-appellant.

Mary Beth Westmoreland, Atlanta, Ga., for respondent-appellee.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.*

---

* All of the Judges of the Court join in the disposition of the six issues referred to in the Introduction to Judge Anderson's opinion for the Court, reinstating the panel opinion with respect to those six issues.

All of the Judges of the Court join in Part I of Section One of Judge Anderson's opinion concluding that there is a *Sandstrom* violation. Judge Hill has also written separately on this issue.

The following Judges join in Part II of Section One of Judge Anderson's opinion concluding that the *Sandstrom* error is not harmless: Godbold, Chief Judge, and Judges Roney, Tjoflat, Hill, Vance, Johnson, Hatchett, Anderson and Clark. Judge Hill has also written a separate concurrence on this issue. Judge Kravitch has filed a dissenting opinion on this issue, joined by Judges Fay and Henderson.

The following Judges join in Section Two of Judge Anderson's opinion, concluding that the

.R. LANIER ANDERSON, III, Circuit Judge:

## INTRODUCTION

This case was taken en banc principally to consider two of the several constitutional claims asserted by appellant William Brooks. In Section One of this opinion, we discuss the claim that the instructions on malice at Brooks' trial improperly shifted the burden of proof in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We conclude that there was a *Sandstrom* violation, and that the error was not harmless beyond a reasonable doubt. In Section Two of this opinion, we discuss Brooks' claim that the prosecutor's argument during the sentencing phase [1] of his capital trial rendered the sentencing phase fundamentally unfair. We reject Brooks' argument in this regard, and conclude that his sentencing phase was not fundamentally unfair.

In addition to the two issues which this opinion will discuss, Brooks asserted six other constitutional claims: (1) that the failure to grant a change of venue was improper; (2) that the introduction of nonstatutory aggravating circumstances during the sentencing phase of the trial was impermissible; (3) that the trial court restricted the admission of mitigating testimony; (4) that the trial court's instructions on aggravating circumstances were improper; (5) that jurors were improperly excluded because of opposition to the death penalty; and (6) that the district court's denial of an evidentiary hearing was incorrect. The panel declined to grant relief on any of these six issues. *Brooks v. Francis*, 716 F.2d 780 (11th Cir.1983), *vacated for reh'g en banc*, 728 F.2d 1358 (11th Cir.1984). With respect to each of these six issues, we reinstate Parts IV, VI, VII, VIII, X and XI of the panel opinion.

Brooks was convicted of armed robbery, rape, kidnapping, and murder by a Muscogee County, Georgia, jury. The evidence established that Brooks abducted Carol Jeannine Galloway from her home, forced her against her will to drive away with him in her yellow Fiat automobile, took her to a secluded area and raped her. All this was established by Brooks' own written confession, and was corroborated by independent evidence. In his confession, Brooks also stated that, after the sexual intercourse and after Galloway had put her clothes back on, she started screaming, and at that point he aimed his pistol at her to make her stop screaming, and that the pistol went off and hit her. Brooks fled at that point, and Galloway bled to death. Additional facts relevant to the two issues discussed in this opinion will be set out later as appropriate.

Brooks was sentenced to death on the murder charge, to life imprisonment on the kidnapping and rape charges, and to 20 years imprisonment on the armed robbery charge.

All convictions and sentences were affirmed by the Georgia Supreme Court on direct appeal. *Brooks v. State*, 244 Ga. 574, 261 S.E.2d 379 (1979). On writ of certiorari to the United States Supreme Court, the Court vacated the decision of the Georgia Supreme Court insofar as it upheld Brooks' death sentence and remanded the case for further consideration in light of *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *Brooks v. Georgia*, 446 U.S. 961, 100 S.Ct. 2937, 64 L.Ed.2d 821 (1980). On remand, the Supreme Court of Georgia reaffirmed the sentence of death. *Brooks v. State*, 246 Ga.

---

prosecutorial argument did not render the sentencing phase fundamentally unfair: Godbold, Chief Judge, and Judges Roney, Tjoflat, Hill, Fay, Vance, Henderson, Hatchett and Anderson. Judge Johnson has filed a dissenting opinion on this issue, joined by Judges Kravitch and Clark. Judge Clark has filed a dissenting opinion on this issue, joined by Judges Kravitch and Johnson.

1. Brooks also claims that improper prosecutorial argument during the guilt phase of his trial rendered that phase fundamentally unfair. The panel rejected Brooks' argument with respect to the guilt phase; we agree with both the judgment and reasoning of the panel in this regard.

262, 271 S.E.2d 172 (1980), *cert. denied,* 451 U.S. 921, 101 S.Ct. 2000, 68 L.Ed.2d 312 (1981), *petition for reh'g denied,* 452 U.S. 932, 101 S.Ct. 3069, 69 L.Ed.2d 433 (1981). Brooks sought and was denied collateral relief in the Georgia courts, and the Supreme Court again denied certiorari. *Brooks v. Zant,* 459 U.S. 882, 103 S.Ct. 183, 74 L.Ed.2d 148 (1982), *petition for reh'g denied,* 459 U.S. 1060, 103 S.Ct. 482, 74 L.Ed.2d 627 (1982).

Brooks then filed the instant petition for habeas corpus relief in the United States District Court for the Middle District of Georgia. The district court denied relief. On appeal, a panel of this court granted relief only on the issue involving the prosecutor's argument during the sentencing phase. *Brooks v. Francis,* 716 F.2d 780 (11th Cir.1983). A petition for rehearing en banc was granted, thus vacating the panel opinion. 728 F.2d 1358 (11th Cir.1984).

### SECTION ONE: *SANDSTROM* ISSUE

### I. WAS THERE AN IMPERMISSIBLY BURDEN–SHIFTING INSTRUCTION UNDER *SANDSTROM*? [2]

■ Brooks was charged in a four-count indictment, the first count of which was malice murder. Brooks argues that the trial judge's instruction regarding malice was impermissibly burden-shifting under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The relevant part of the instruction reads as follows:

The law of the State of Georgia says that a person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external

circumstances capable of proof. Malice shall be implied, the law says, when no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

The law, ladies and gentlemen, *presumes every homicide to be malicious until the contrary appears* from circumstances of alleviation, excuse, or justification, and *it is encumbent upon the accused to make out such circumstances* to your satisfaction unless they appear from the evidence produced against him.

(Emphasis added).[3] This instruction, which placed upon the defendant the initial burden of disproving malice, is virtually identical to the one found impermissible in the recent en banc case of *Davis v. Kemp,* 752 F.2d 1515, 1519–20 (11th Cir.1985) (en banc). The analysis employed in our *Davis* opinion was recently confirmed by the similar analysis used by the Supreme Court in *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The instruction here is a mandatory rebuttable presumption, as were the instructions found impermissible in *Davis* and *Franklin. Davis,* 752 F.2d at 1517–20; *Franklin,* —— U.S. at —— – ——, —— – ——, 105 S.Ct. at 1970–1971, 1972–1973. We conclude that the instruction here impermissibly shifted the burden of proof with respect to malice, a necessary element of the murder charge against Brooks.

The state argues that the malice instruction, when read in conjunction with the entire jury charge, did not "so infect the entire trial that the resulting conviction violate[d] due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The state's argument is a subtle one, and depends upon several building blocks. First, the state correctly notes that malice murder in Georgia is defined as an intentional killing done without

---

**2.** Although defense counsel made no objection to the jury charge at trial, there is no procedural default because the state court reached the *Sandstrom* issue on the merits, *Brooks v. Zant,* No. 5142, slip op. 16–17 (Sup.Ct. Butts Cty. Feb. 2, 1982), *cert. denied,* 459 U.S. 882, 103 S.Ct. 183, 74 L.Ed.2d 148 (1982), and the state has not

claimed procedural default in this court or the district court; nor has it argued that defense counsel's failure to object should otherwise affect the *Sandstrom* analysis.

**3.** The entire jury charge is attached as Appendix A to this opinion.

provocation or justification. *Lamb v. Jernigan*, 683 F.2d 1332, 1336 (11th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). Second, the state argues that there was in this case no hint of provocation or justification,[4] so that the only sub-element of malice which might possibly have been in dispute was intent. Third, the state argues that a separate intent instruction was given, which properly instructed the jury that intent "may be inferred" from all the facts and circumstances.[5] Thus, the state argues that the jurors would have understood the malice instruction to refer to the earlier intent charge for a definition of the intent component of malice; and, the argument continues, the improper burden-shifting presumption in the malice charge would have affected only the sub-issues of provocation and justification, and not the sub-issue of intent.

The problem with the state's argument is that the malice instruction does not either expressly or impliedly refer for a definition of intent to the earlier intent instruction. Moreover, the intent instruction appeared a full six pages prior to the malice instruction.

After a careful review of the malice instruction, in the context of the entire charge including the earlier intent instruction, we cannot discount the possibility that a reasonable jury could have understood the instructions to create an unconstitutional presumption of malice and its intent component. *See Franklin*, —— U.S. at ——, —— n. 8, 105 S.Ct. at 1971, 1975 n. 8.[6] As the Supreme Court said in *Sandstrom*, "we have no way of knowing that ... [the defendant] was not convicted on the basis of the unconstitutional instruction." *Sandstrom*, 442 U.S. at 526, 99 S.Ct. at 2460; *accord, Franklin*, —— U.S. at ——, 105 S.Ct. at 1975 n. 8. At best, the contradictory instructions as to intent and malice may have confused the jury as to the proper burden of proof. *See Franklin v. Francis*, 720 F.2d 1206, 1212 (11th Cir.1983), *aff'd*, —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (—— U.S. ——, 105 S.Ct. at 1975: "Nothing in these specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other. Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity").[7]

---

4. Although there was in fact no hint of provocation, there was an issue of accident, *see infra* at 1392, which might be considered an aspect of justification. Thus, one of the building blocks on which the state constructs its argument is undermined. In fact, the state's argument focuses the error on the very sub-issue, *i.e.*, whether the killing was non-accidental, as to which there is not overwhelming evidence, and as to which there might have been a reasonable doubt. *See infra* Part II of Section One.

5. The intent instruction to which the state refers reads as follows:

Now, ladies and gentlemen, criminal intent being an essential element of every crime, it is a question of fact to be. determined by you whether such intent existed in the mind of this defendant at the time of the alleged crime. Intent can be established by evidence, but it must be evidence which will satisfy your minds beyond a reasonable doubt. Intent may be shown in many ways, ladies and gentlemen, provided you find that it existed from the evidence produced before you during this trial. It may be inferred from proven

circumstances, or by acts and conduct of the defendant, or it *may be presumed when it would be the natural and necessary consequence of that act.*

(Emphasis added). It is true that this court in *Lamb* construed an identical intent instruction as being permissive, *Lamb v. Jernigan*, 683 F.2d 1332, 1338–40 (11th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983), and that the en banc court in *Davis* cited *Lamb* approvingly in this regard. *Davis v. Kemp*, 752 F.2d 1515, 1518 n. 3 (11th Cir.1985) (en banc).

6. *Accord, Sandstrom v. Montana*, 442 U.S. 510, 517, 99 S.Ct. 2450, 2455, 61 L.Ed.2d 39 (1979).

7. We note that *Lamb v. Jernigan* is virtually indistinguishable from the instant case. It involved an impermissible malice instruction virtually identical to the instant malice instruction, and also a separate intent instruction which was virtually identical to the intent instruction in this case. The permissive intent instruction in *Lamb* did not cure the unconstitutional malice instruction, nor does it in this case. *See Lamb v. Jernigan*, 683 F.2d at 1341.

For the same reasons, we reject the state's argument that the unconstitutional malice instruction was cured by the general instructions establishing the presumption of innocence and the state's burden of proving every element of the crime. This is the same argument that was expressly rejected by the Court in *Franklin* and *Sandstrom.* As the Supreme Court noted, the jury might have relied upon the improper burden-shifting presumption either as a means for rebutting the presumption of innocence, or as a means by which proof beyond a reasonable doubt could be satisfied. *Franklin,* —— U.S. at ——, 105 S.Ct. at 1973; *Sandstrom,* 442 U.S. at 518 n. 7, 99 S.Ct. at 2456 n. 7.

After a careful review of the entire jury charge, we find that a reasonable juror could well have concluded that Brooks bore the burden of proof on the necessary element of malice. We thus conclude that the instruction violates *Sandstrom.*

## II. WAS THE *SANDSTROM* ERROR HARMLESS?

■ The state maintains that even if the malice instruction was impermissibly burden-shifting under *Sandstrom,* this error was harmless. The Supreme Court has expressly left open the question whether a *Sandstrom* error can ever be harmless. *Franklin,* —— U.S. at ——, 105 S.Ct. at 1977. However, our en banc court in *Davis* recently reaffirmed for this circuit that a *Sandstrom* error, like most other errors of constitutional magnitude, can be held harmless beyond a reasonable doubt. *Davis v. Kemp,* 752 F.2d at 1520–21; *see also McCleskey v. Kemp,* 753 F.2d 877, 902 (11th Cir.1985) (en banc). *Davis* identified two situations where a harmless error analysis is appropriate: (1) where the evidence of the defendant's guilt was overwhelming; and (2) where the instruction concerned an element of the crime which was not in issue at trial.[8] *Davis,* 752 F.2d at 1521.

In this case, the evidence did create an issue with respect to malice; thus, we focus on the first situation. *Davis* clarified the fact that this first prong should properly focus on whether the evidence of *intent,* rather than the more inclusive issue of *guilt,* is overwhelming. The evidence adduced at Davis' trial overwhelmingly indicated "that whoever killed the victim did so with intent and malice." *Davis,* 752 F.2d at 1521. Although the evidence that Davis was the killer may not have been overwhelming, in light of Davis' testimony to the contrary, the court stated succinctly that the appropriate inquiry was whether the evidence of *intent* was overwhelming, not whether there was overwhelming evidence that Davis was the guilty killer:[9]

> Although some opinions talk in terms of overwhelming *evidence of guilt,* (which will obviously always include the necessity of overwhelming evidence of intent), the analysis in the text makes it clear that the crucial inquiry relates to whether or not there is overwhelming evidence of intent. *See Connecticut v. Johnson,* 460 U.S. [73] at 86 [103 S.Ct. 969 at 977, 74 L.Ed.2d 823] (Blackmun, J.) and at 90, 96, 97, 99, 101 [103 S.Ct. at 979, 982, 983, 984, 985] (Powell, J.). The jury in this case concluded that Davis was the killer, and that conclusion could not have been affected by the erroneous instruction. Thus, overwhelming evidence that Davis was the killer is not required.

*Davis,* 752 F.2d at 1521 n. 10 (emphasis in original); *accord, Franklin v. Francis,* 720 F.2d 1206, 1212 (11th Cir.1983), *aff'd,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (—— U.S. at ——, 105 S.Ct. at 1977: affirming this "court's conclusion that the evidence of intent was far from overwhelming ...").

*Davis* also emphasized that the nature of the defense at trial is an important factor in assessing whether there is overwhelming evidence of intent. In *Davis,* the

---

**8.** *See McCleskey v. Kemp,* 753 F.2d 877, 903–04 (11th Cir.1985) (en banc).

**9.** The reason for this focus is apparent. In the usual case, as in *Davis,* the erroneous intent instruction could not possibly affect the jury's determination of who the killer was.

thrust of the defense was Davis' non-involvement in the killing, and the defense made no effort to rebut the overwhelming evidence that whoever killed the victim did so with intent and malice. While intent remained at issue in the sense that it was not conceded and the burden of proof remained on the state, the *Davis* court expressly considered as important the fact that the defense did not contest the issue of intent, thus leaving unrebutted the overwhelming evidence that the killing was intentional.[10]

The foregoing discussion of *Davis* stands in contrast to the trial in this case. Brooks presented what can best be termed a "hybrid" defense. His lawyer, like most thorough and competent defense lawyers, cross-examined most of the state's many witnesses in an attempt to undermine their credibility, recall and perception of events. Unquestionably, the major objective of the defense was to cast blame on another man who was arrested shortly after the crimes as a material witness and who testified for the state at trial. Brooks' theory in this regard was that the failure of some witnesses to positively identify Brooks, and those witnesses' inclinations to identify the other man,[11] tended to exonerate Brooks. Brooks also attempted to show that the shirt found at the scene of the crimes would have fit the other man, a man allegedly much larger than himself. It is true that the thrust of defense counsel's closing argument, in the face of overwhelming evidence to the contrary, was that a reason-

able doubt as to Brooks' guilt had been raised by reference to the evidence concerning the other man.

However, unlike the situation in *Davis*, Brooks' intent to kill was clearly put in issue at trial. The state relied heavily on a confession which Brooks gave to the police in which he admitted kidnapping, raping, robbing, and killing Carol Galloway. In fact, the only evidence adduced at trial concerning the fact of the killing itself was derived from Brooks' confession. In the confession, Brooks stated that after he raped the victim, he pointed his pistol at her to keep her from screaming and the pistol "went off." Brooks never conceded that he intended to kill and he pled not guilty to the charge of malice murder. Indeed, the prosecutor in his closing argument explicitly referred to the accident defense, urging the jury to disbelieve it:

> Now, one other thing [the judge] is going to charge you on, in [Brooks'] statement ..., he says that she was saying let me go, and screaming, and he took his gun out and pointed it at her, tried to make her hush, you will recall that, and that he pulled the hammer back, and the gun went off. He doesn't say it was an accident, but he leaves that implication. And, the Court is going to charge you on accident. We say to you when you are in that kind of situation, and you've got your finger on the trigger and you point

**10.** *See Connecticut v. Johnson*, 460 U.S. 73, 87, 103 S.Ct. 969, 977, 74 L.Ed.2d 823 (1983) (Blackmun, J., writing for a plurality of four justices) ("In addition, a *Sandstrom* error may be harmless if the defendant conceded the issue of intent.... In presenting a defense such as alibi, insanity, or self-defense, a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless.... We leave it to the lower courts to determine whether by raising a particular defense or by his other actions, a defendant himself has taken the issue of intent away from the jury").

If a *Sandstrom* error can be harmless when the issue of intent is conceded, it is only a short

step to hold that the harmless error doctrine should similarly be applicable where a defendant does not formally concede intent, but focuses his defense entirely upon alibi or a similar defense, in the face of overwhelming evidence that whoever committed the offense did so intentionally. When such overwhelming evidence of intent is left wholly unrebutted, it is not unreasonable to think that an appellate court can, depending upon all the facts and circumstances of the case, be satisfied beyond a reasonable doubt that the error was harmless. The appellate court can do so just as readily as in a case where the issue of intent was conceded.

**11.** Only one witness, a 12-year old girl, actually made a positive identification of the other man during a line-up.

the gun at somebody, you pull the hammer back, it ain't no accident.[12] Significantly, the trial court did charge the jury on accident. Finally, in briefing this case before the panel, the state acknowledged that Brooks' defense to the malice murder charge was one of accident. The state argued that the facts and circumstances of the case properly led the jury to the conclusion that Brooks had acted intentionally, but recognized that if the jury chose to believe Brooks' version it would have exonerated him of the charge of malice murder.

Acknowledging, as we must, that the accident issue was squarely before the jury and that Brooks' statement indicating that the gun went off unintentionally, if believed, would have exonerated him of the charge of malice murder, we review the case to see if the *Sandstrom* error was harmless beyond a reasonable doubt. The facts adduced at trial tended to show that Brooks abducted Carol Jeannine Galloway from her home and drove away with her in an automobile. In a statement to police, Brooks confessed, as indicated above, that he had kidnapped, raped, robbed, and killed Galloway. The statement strongly implied, however, that the killing was accidental. He pointed the gun at Galloway, he stated, to scare her into being quiet because she had begun to scream after the rape. Brooks said that at that point the gun simply "went off" and killed Galloway. The evidence indicates that Galloway died of one gunshot to the neck. Brooks did admit in his statement to the police that after Galloway fell to the ground he "got scared" and fled the scene of the crimes.

In support of his argument that the *Sandstrom* error was not harmless, Brooks cites the case of *Franklin v. Francis*, 720 F.2d 1206, 1208–12 (11th Cir.1983), *aff'd,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In *Franklin,* the de-

fendant admitted that he fired the gun which killed the victim. The defendant arrived at the victim's home, with a woman he had kidnapped, and demanded the keys to the victim's car at the threshold of the victim's home. After the demand, the victim proceeded to slam the door in the defendant's face at which time, the defendant testified, the gun simply "went off," accidentally killing the victim. The evidence showed that the bullet travelled through the door before killing the victim. The defendant then fired a second shot into the ceiling. The court held that the *Sandstrom* error could not be considered harmless:

> [The defendant's] only defense was that he did not have the requisite intent to kill. The facts did not overwhelmingly preclude that defense. The coincidence of a first shot with the slamming of the door, the second shot's failure to hit anyone, or take a path on which it would have hit anyone, and the lack of injury to anyone else all supported the lack of intent defense. A presumption that Franklin intended to kill completely eliminated his defense of "no intent." Because intent was plainly at issue in this case, and was not overwhelmingly proved by the evidence ..., we cannot find this error to be harmless.

*Franklin v. Francis,* 720 F.2d at 1212.[13] The Supreme Court, without deciding the question whether a *Sandstrom* error can ever be harmless, has recently affirmed the decision in *Franklin,* by explicitly relying on our "court's conclusion that the evidence of intent was far from overwhelming ...." *Francis v. Franklin,* —— U.S. at ——, 105 S.Ct. at 1977.

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), sets out the standard by which most constitutional errors should be considered harmless. Un-

---

**12.** It should be noted that the prosecutor's description of Brooks' statement was somewhat of an embellishment, as Brooks never admitted to having his finger on the trigger.

**13.** We acknowledge that in the instant case the harmless error determination presents a closer

question than in *Franklin.* The evidence of accident in *Franklin* was stronger than in this case; the evidence of intent and malice in this case is stronger than that which was present in *Franklin.*

der *Chapman,* a criminal conviction must be reversed if the appellate court cannot say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828. In applying *Chapman,* we must look at the constitutional error involved. The instruction as to malice stated that "[t]he law ... *presumes* every homicide to be malicious *until* the contrary appears from the circumstances of alleviation, excuse or justification ...." (Emphasis added). Thus, the jury was instructed that it was required by law to presume that Brooks acted maliciously because a bullet from the gun he was holding caused the death of Carol Galloway. Brooks was thus forced into the position of having to disprove malice, an essential element of malice murder under Georgia law. This the state may not do. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (state has burden of proving every element of the crime charged beyond a reasonable doubt). Moreover, the burden of proof was placed upon Brooks on what was in fact *the* essential element in Brooks' case, since the evidence of Brooks' participation in the kidnapping, robbery, rape, and even the killing was otherwise overwhelming. *Brooks v. Francis,* 716 F.2d 780, 794 (11th Cir.1983), *vacated for re-*

*hearing en banc,* 728 F.2d 1358 (1984). As reflected by Brooks' statement to the police, it was the only issue, in practical effect, subject to dispute with respect to the malice murder charge.

Of course, the jury was free to discredit Brooks' statement as to the accidental nature of the killing. Because of the erroneous charge, however, we cannot determine whether the jury disbelieved Brooks, or whether it merely applied the erroneous presumption that every homicide is malicious. Brooks' statement was the only direct evidence as to whether the killing was accidental or malicious. The jury could reasonably have inferred that the killing was malicious from the evidence that Brooks kidnapped, robbed, and raped Galloway and from the evidence that he threatened her with a gun to stop her from screaming. However, it is of course possible to kidnap, rob, rape and even threaten without intending to kill.[14] We must insure that the jury's role is not impaired and rendered conviction-prone by an unconstitutional burden-shifting instruction. Considering all the facts and circumstances, we cannot conclude "beyond a reasonable doubt that the [*Sandstrom*] error complained of did not contribute to the [mur-

**14.** The state argues that the instruction is harmless because there was overwhelming evidence that Brooks did kidnap, rape, rob and kill Galloway. *See also* the panel opinion in this case. *Brooks v. Francis,* 716 F.2d 780, 794 (11th Cir. 1983), *vacated for reh'g en banc,* 728 F.2d 1358 (1984). *Davis* demonstrates, however, the fallacy of the state's argument—the failure to distinguish between the issue of who was the killer and the issue of the killer's intent. Although there is overwhelming evidence in this case that Brooks was the killer, that fact does not constitute overwhelming evidence that the killing was intentional and malicious. *Davis,* 752 F.2d at 1521 n. 10.

Judge Kravitch's dissent apparently finds overwhelming evidence of intent to kill from the evidence that Brooks threatened the victim with the loaded and cocked weapon. *See post,* at 1423 (Kravitch, J., dissenting) ("the jury could not possibly have ignored the evidence that the appellant threatened the victim with a loaded pistol to accomplish the abduction and rape, but not until she began screaming did he aim the pistol at her *and cock it* or '*pull the hammer,*' a

preliminary act to firing the weapon. This evidence, although circumstantial, and based upon Brooks' confession, nevertheless implies that he pulled the hammer in order to fire the weapon"). Respectfully, we think the dissent has presumed intent to kill merely because of the "natural and probable consequences" of Brooks' acts. The Supreme Court has only recently held that a jury instruction is unconstitutional if "a reasonable juror could thus have thought that, although intent must be proved beyond a reasonable doubt, proof of the firing of the gun and its ordinary consequences, constituted proof of intent beyond a reasonable doubt...." *Francis v. Franklin,* — U.S. —, —, 105 S.Ct. 1965, 1973–1974, 85 L.Ed.2d 344 (1985). Obviously, it is possible to threaten with a cocked and loaded weapon without intending to kill, and it seems to us inescapable that the reasonable inferences include not only intent to kill but also intent to threaten. The jury was free to draw either inference. The problem here, however, is that the burden-shifting instruction improperly placed the burden of proof on Brooks.

der] verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

Accordingly, the district court erred in denying the writ of habeas corpus with respect to the malice murder conviction only.

## SECTION TWO: PROSECUTORIAL ARGUMENT AT SENTENCING PHASE [15]

This section of the opinion will be addressed as follows. Part I recounts the facts of Brooks' case relevant to this issue, focusing particularly on the evidence and argument at the penalty phase of his capital trial. Part II discusses the relevant "fundamental fairness" standard, elaborating upon it in light of *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Part III examines the Georgia capital sentencing trial for the purpose of determining what may be appropriately argued to the jury as a justification for imposing death. Part IV considers the prosecutor's closing argument in the sentencing phase of this case and recognizes certain improper arguments. Finally, Part V examines the improper arguments to determine whether they entitle Brooks to relief.

### I. FACTS

William Brooks was arrested and tried for the tragic July, 1977 murder of Carol Jeannine Galloway. The jury found the 22-year old Brooks guilty of murder, kidnapping, rape, and armed robbery. The prosecutor, Mr. Mullins Whisnant, decided to seek the death penalty in Brooks' case.[16] Therefore, following conviction, the jury reconvened for the penalty phase of Georgia's capital sentencing scheme. Ga.Code Ann. § 17–10–2(c) (1982). The trial court

informed the jury that it would hear evidence and argument from both the state and the defendant on the punishment issue. Because an allegedly improper closing argument can only be analyzed in the context of the entire proceeding, we supplement the above description of the crime with a brief description of the evidence presented at the sentencing phase.

The state called one witness. Danny Dunaway, a probation and parole officer, testified that Brooks had a bad reputation in the community.

Counsel for Brooks called three witnesses to testify in mitigation. Brooks' mother and two sisters testified that Brooks had been severely beaten by his step-father as a child and that he began to get in trouble at that time.

Following the introduction of this evidence, Whisnant made his closing argument for the state.[17] He began with a brief discussion of the "two-fold purpose" of punishment—punishing guilt and deterring like conduct. Concerning the punishment motive, Whisnant argued that "the only appropriate punishment is death in the electric chair."

Whisnant then moved into a more explicit discussion of deterrence. He said "I believe in the death penalty. I think it's necessary." Then, responding to the anticipated argument that the death penalty does not deter, Whisnant claimed:

> ... The last person in Georgia was electrocuted in 1964, and since that date, crime has increased year by year, time after time, every time the statistics come out, we have an increase in crime rate. We didn't have that when we had capital

---

**15.** We might have declined to address Brooks' prosecutorial argument claim, since our decision on the *Sandstrom* issue will require a new trial for malice murder and, thus, a new sentencing hearing if Brooks is found guilty on the malice murder charge. However, for the same reasons that it is desirable in many cases for district courts to address alternatively the several claims in capital cases, we exercise our discretion to proceed in this case, in the mode of an alternative holding, to address the issue of prosecutorial argument at sentencing.

**16.** Under Georgia law, murder may be punished by death or by life imprisonment. Ga.Code Ann. § 16–5–1(d) (1982). The decision to seek death in a given case is a matter of prosecutorial discretion.

**17.** The detailed recitation of the prosecutor's argument that follows is necessary if one is to understand its overall effect.

punishment. We didn't have this kind of murder, these kinds of crimes you've heard about this week, when we had capital punishment. If they were, they were very seldom, we heard about them somewhere else, but not here.[18]

Next, in anticipation of arguments for sympathy by defense counsel, the prosecutor reminded the jury of the victim's high morals, and considerate and thoughtful nature. He also asked "What has the Galloway family gone through, what have they gone through? Next week when it's Thanksgiving, and they are sitting around the table, Carol Jeannine won't be there, and never will be there again."

Argument then turned to the issue of why the prosecutor sought the death penalty here. Whisnant argued:

I've been district attorney for seven and a half years, and we don't take this business of asking for the death penalty lightly. We don't come up here on every murder case that we try and say, "Give the man the electric chair." In the seven and a half years I've been district attorney, I believe we've only asked for it less than a dozen times, I think it's nearer eight or nine, but I know it's less than twelve. So, we take it seriously. We ask you to take it seriously.

He then discussed at length factors that he considered in asking for the penalty and which he suggested justified imposing death. First, he discussed how horrible the crime was. He then described the overwhelming evidence as to guilt. Finally, he raised the issue of rehabilitation and opined that "there's no chance that William Brooks will ever be rehabilitated."

Whisnant next focused on factors particular to Brooks which might call for jury sympathy. He argued that it was "ridiculous" to suggest that Brooks' troubled upbringing should mitigate his punishment. The prosecutor also pointed out that even though Brooks was young, it was still necessary to punish young people because

**18.** The state had not introduced any evidence about crime rates since 1964 nationally or in the

"that's the group that's committing crimes in this country."

Whisnant then made several points directed to possible jury squeamishness about imposing the ultimate punishment. First, he reminded the jurors that they would not be solely responsible for Brooks' death:

Now I'm sure another question that might be going through your mind at this time is, when I get back to that jury room, and we have to vote, and I vote to take somebody's life, can I do it? I know it's rough, it would be hard for me to do. Can I take somebody's life? Well, the truth of the matter is, you're not taking his life, you're not pulling the switch in the electric chair; the police who investigated this case and who apprehended William Brooks, they're not taking his life; the Recorder's Court Judge who heard the evidence in the preliminary hearing, are you going to say he's responsible for taking his life? Of course not. How about the Grand Jury who listened to the evidence and indicted him for murder; are the Grand Jurors responsible for his life, can you say they're about to take his life? Of course not. How about me and my staff, we put the case together and we prosecuted him, and we're here now asking you to bring back the death penalty, do we feel responsible? I don't. I don't think anybody in my office does.

How about the man, if he's electrocuted, who actually pulls the switch, is he responsible for taking his life? Of course not. The person who is responsible for his life is William Brooks himself, and if the switch is pulled and he's put to death, he pulled the switch the morning that he was walking along Saint Mary's Road when he put the gun in the back of Carol Jeannine Galloway and kidnapped her, that's when he took his own life. He's a grown man, and he knew what he was doing.

Columbus, Georgia, area.

Whisnant implied that the jury should not shy away from the death penalty because Brooks himself believed in it:

Now I'm sure the argument is going to be made, either by Mr. Araguel, or maybe some member of the jury that, "Well the death penalty is bad, maybe we can do something else." Well let me say this to you; I told you I believe in it. William Brooks believes in the death penalty, he believes in executing people. He carried Carol Jeannine Galloway down in those woods out of the sight of everybody. Carol Jeannine Galloway didn't have a battery of lawyers around her, she didn't have a judge sitting there ruling on evidence, she didn't get twenty strikes when the jury was selected, she didn't have any courtroom with cameras so that the whole world could see if she got a fair trial. He just stepped back at point-blank range within three feet of her and killed her, shot her. So, he believes in the death penalty, he executed her, a lot more horrible than the electric chair which is a quick thing, brings death on real quickly. She lay there perhaps an hour and a half or two hours before she bled to death.

He asked the jury to show Brooks the same sympathy that he showed his victim, *i.e.,* none.

Continuing in the same vein, Whisnant argued the impropriety of a life sentence, suggesting that Brooks might kill a guard or a prisoner. For example, he argued:

And the next thing is, he has demonstrated that he's a killer. Anybody who can kill a poor defenseless person, or murder a poor defenseless person like he did will kill again. He doesn't care, life doesn't mean anything to him. So you put him in prison. How about those guards that have to guard him. They have families depending on them, how do you know he won't kill one of them?

The prosecutor suggested escape and asked the jurors, "Whose daughter will it be next time?"

Whisnant then argued:

And this is—I'm going to say this, and maybe you don't agree with me, and I'm sure I'll be accused of being materialistic in saying it, but why should—if he's given life, it cost money to keep him, thousands of dollars a year to keep a prisoner housed, fed and clothed, and medical care, why should the taxpayers, and that's you folks, all of us, why should the taxpayers have to keep up somebody like William Brooks the rest of his life when he's done what he's done?

Whisnant then delivered an extended analogy between jurors and soldiers.

Let me say this to you, during my lifetime this country has been in three wars, each war we've taken our young men down to the age of seventeen, we've trained them, we've put guns in their hands, we've taught them how to kill the enemy, and we've sent them overseas, and they have killed other human beings who are enemies of our country, and when they did a good job of killing them, we decorated them and gave them citations, praised them for it.

Well, I say to you that we're in a war again in this country, except it's not a foreign nation, it's against the criminal element in this country, that's who we're at war with, and they are winning the war, is what's so bad, and if you don't believe they are winning, just look about you. You don't dare get out on the streets at night and walk around, you don't dare leave your house unlocked. In fact, most everybody I know has added more locks to their house, and burglar bars, and burglar alarms. And, we've got a man here in town who makes a living with guard dogs. And, if you go to the hospital to see some of your friends, you've got to get by a security place up there, and you see security guards everywhere. Why are they there? Because of the criminal element in this country. It's winning.

And, if we can send a seventeen-year old young man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case against William Brooks, and

I submit to you that he's an enemy, and he's a member of the criminal element, and he's our enemy, and he's an enemy of the law abiding citizens and the people who want to live peacefully in this country, and who want to be secure in their persons and their homes.

You know, lots of times you see people on the street, and they are always stopping us and saying, "You know, something's got to be done about this crime wave, what can we do, Mr. Whisnant; what can we do, Mr. Smith, we've got to do something about it." Well, you have an opportunity to do something about it right now. The police have investigated the case, we've prosecuted it the best we know how, and you're in the position of Harry Truman, who had on his desk a sign that said, "The Buck Stops Here." The buck stops with you today. And you can do something about it. You can bring back the death penalty and you can tell William Brooks, and you can tell every other criminal like him, that if you come to Columbus and Muscogee County, and you commit a crime, and it's one of those crimes that's punishable by death, and if the aggravating circumstances are there, you are going to get the electric chair, that's what you can do. And, I believe that will stop some of the crime.

Following this "war on crime" argument, Whisnant compared Brooks to a cancer that should be cut out to save the body of society. He claimed that Brooks would never kill again if the jury returned a death verdict.

■ Whisnant concluded his argument with a brief recapitulation of the facts of the crime, including the following:

... He was just walking along with a pistol in his pocket, and he decided, "well, I'll make a hustle," to use their language, his language. And then after he did that, "Well, I'll rape her," so he carried her down in the woods and raped her and shot her and left her there bleeding to death.

He reminded the jury that they had indicated at voir dire that they were not conscientiously opposed to the death penalty, and that they could vote for death if the facts and circumstances warranted it. He asked the jury to go to the jury room, consider the facts and circumstances, and bring back a verdict of death.[19]

Brooks' counsel then made his closing argument. He emphasized juror responsibility for this "hardest decision of your life." He specifically rebutted any implication in Whisnant's argument that might suggest that the grand jury, the prosecutor, and others shared responsibility for the sentence:

None of those people that he named had the decision-making responsibility, only you twelve have that decision-making responsibility, whether this man lives or this man dies.

---

**19.** Counsel did not enter any objections during Whisnant's closing. Although counsel's failure to object to the argument does not bar our review of the claim in this case, the lack of an objection is a factor to be considered in examining the impact of a prosecutor's closing argument. *United States ex rel. Smith v. Rowe,* 618 F.2d 1204, 1211 n. 3 (7th Cir.1980), *vacated sub nom, Franzen v. Smith,* 449 U.S. 810, 101 S.Ct. 57, 66 L.Ed.2d 13 (1980), *reinstated, United States ex rel. Smith v. Franzen,* 660 F.2d 237 (7th Cir. 1981); *cf. United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (on direct review of federal conviction, failure to object to improper prosecutorial argument is judged under "plain error" standard). The lack of an objection may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging. Such an implication cannot be drawn from the record here—a colloquy during the defense's closing revealed that Brooks' attorney knew the prosecutor's argument was objectionable, but abstained from objection out of professional courtesy. Such courtesy should not be maintained in the face of an improper closing argument; errors can be cured more easily by a trial court following instantaneous objection than by a reviewing court laboring to discern the effect of printed words upon an unseen jury. In any event, because we conclude that the arguments were not severe enough here to render the sentencing "fundamentally unfair," we need not consider precisely how the lack of objection should be assessed.

Defense counsel also rebutted Whisnant's "war on crime" argument:

> The District Attorney argued that you were being called upon to be nothing less than soldiers in the service of your country, which I know some of you have served also in the armed forces. But, a soldier doesn't have time to contemplate, and he isn't asked to make decisions about whether anyone lives or dies, and that is the difference, because you have that power, you have that decision-making responsibility upon your shoulders, as to whether this man will live or die.

Counsel for Brooks then noted that no punishment, however serious, could bring the victim back. He discussed the sanctity of life and the Biblical commandment "Thou shalt not kill."

Turning to the penological justifications argued by the prosecutor, defense counsel stressed the possibility of rehabilitation, argued that the death penalty is not a deterrent, and referred to many studies to this effect, noting that "most of you probably are familiar with these studies." Finally, he questioned the weight of evidence on guilt and reminded the jury of Brooks' troubled childhood.

The trial judge then instructed the jury. He charged that the jury's first responsibility was to determine whether any mitigating or aggravating circumstances existed at the time the murder was committed. He charged that the jury would be authorized to recommend the death penalty only if it found beyond a reasonable doubt the existence of one or more of three statutory aggravating circumstances. The three aggravating circumstances were read to the jury.[20] The jury was also told that, even if

aggravating circumstances did exist, it could still recommend life imprisonment. Driving home the sole responsibility of the jury he charged:

> If you recommend the death penalty, then the court is required by law to sentence the defendant to death. On the other hand, you can see fit, ladies and gentlemen, whether aggravating circumstances existed or not, to recommend mercy for the defendant if this should be your finding, then in that event the court is required by law to sentence the defendant to life imprisonment.

With respect to the facts and circumstances to be considered by the jury, the judge gave a clear definition of both mitigating circumstances and aggravating circumstances, and charged the jury as follows:

> In arriving at your determination, you are authorized to consider all the evidence received throughout this trial, presented by both the state and the defendant. You are authorized to include in your consideration the facts and circumstances, if any, in mitigation and aggravation.[21]

After deliberating for approximately one hour, the jury returned its verdict of death.

## II. STANDARD OF REVIEW

Appellant claims that the prosecutor's closing argument contained repeated references to irrelevant, arbitrary, and prejudicial factors as reasons to impose the death penalty. He correctly points out that the argument is very similar to one found "fundamentally unfair" by a panel of this court in *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct.

---

**20.** The three aggravating circumstances were (1) that the murder was committed while the offender was engaged in a rape; (2) that the murder was committed while the offender was engaged in an armed robbery; and (3) that the murder was "outrageously, or wantonly vile, horrible or inhumane in that it involved an aggravated battery to the victim." A valid finding of even one of these circumstances would support the death penalty. Because the jury had already found Brooks guilty beyond a reasonable doubt of rape and armed robbery of

Galloway, the existence of aggravating circumstances was not in doubt in this case. Thus, the arguments of counsel were not concerned principally with the statutory circumstances rendering Brooks eligible for death, but rather with the jury's broad discretion to choose between death and life imprisonment.

**21.** No instruction was given concerning how to evaluate arguments of counsel.

3544, 77 L.Ed.2d 1393 (1983).[22] We now reexamine the issue as an en banc court, overruling any implications in *Hance* inconsistent with this opinion.

### A. Dangers of Prosecutorial Argument

It has long been recognized that misconduct by a prosecuting attorney in closing argument may be grounds for reversing a conviction. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934). Part of this recognition stems from a systemic belief that a prosecutor, while an advocate, is also a public servant "whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." 295 U.S. at 88, 55 S.Ct. at 633.

Beyond a concern with the inherent role of the prosecuting attorney, courts have also noted that prosecutorial misconduct is particularly dangerous because of its likely influence on the jury. Speaking of the prosecutor's duty to seek justice, the *Berger* Court stated:

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge, are apt to carry much weight against the accused when they should properly carry none.

295 U.S. at 88, 55 S.Ct. at 633; *see also United States v. Morris*, 568 F.2d 396, 402 (5th Cir.1978);[23] *Hall v. United States*, 419 F.2d 582, 583–84 (5th Cir.1969). Thus, our review of alleged errors in argument must be informed by an awareness that the prosecutorial mantle of authority can intensify the effect on the jury of any misconduct.[24]

### B. Donnelly v. DeChristoforo

Notwithstanding the dangers discussed above, our review of a state prosecutor's argument on a petition for writ of habeas corpus is more limited than if we were examining errors of a federal prosecutor on direct appeal. The *Berger, Morris* and *Hall* cases were federal prosecutions and, while their standards provide guidance for reviewing claims on habeas corpus, *Houston v. Estelle*, 569 F.2d 372, 380–81 (5th Cir.1978), our predecessor court has noted that Georgia prosecutors are allowed more freedom in jury arguments than their federal counterparts. *Bryant v. Caldwell*, 484 F.2d 65, 66 (5th Cir.1973), *cert. denied*, 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974).

In *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the Supreme Court set forth the standard for reviewing habeas corpus petitions raising the impropriety of a state prosecutor's argument. In that case, petitioner was tried in Massachusetts for a first-degree murder. During closing, the prosecutor referred to defense counsel by saying "They said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." Counsel objected that the remark, coupled with the fact that a co-defendant had pled guilty during the trial, constituted a suggestion to the jury that the defendant had sought to plead guilty to a lesser-included offense

---

**22.** Hance was prosecuted by the same district attorney's office in Muscogee County.

**23.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**24.** Concerning the jury's perception of the role of a prosecutor, it is interesting to note that the trial court in Brooks' case assigned to Whisnant the task of swearing in the jury. The practice of allowing anyone other than the judge or clerk of court to perform this duty was forbidden by statute in 1979. Ga.Code Ann. § 15–12–132 (1982). In *Ates v. State*, 155 Ga.App. 97, 270 S.E.2d 455 (1980), the Georgia Court of Appeals reversed a conviction obtained following prosecutorial swearing of jurors in violation of the statute, finding that "we are unable to determine the prejudice that may form in the juror's minds when the oath is administered by the prosecuting arm of the state." 155 Ga.App. 97, 270 S.E.2d at 456.

and was refused by the prosecution. The trial court instructed the jury to disregard the remark.

The Supreme Court, while acknowledging that the remark may have been improper, reversed the lower court's grant of habeas relief. In holding that the relevant inquiry was whether the remark violated due process, the majority stated that "not every trial error or infirmity ... constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.' *Lisenba v. California,* 314 U.S. 219, 236 [62 S.Ct. 280, 289, 86 L.Ed. 166] (1941)." 416 U.S. at 642, 94 S.Ct. at 1871. After examining the isolated and possibly unintentional remark, particularly in light of the curative instruction given by the trial court, the Court expressed its inability to conclude "that this incident made [DeChristoforo's] trial so fundamentally unfair as to deny him due process." 416 U.S. at 645, 94 S.Ct. at 1872.

The *Donnelly* decision provides important guidelines for reviewing allegedly improper prosecutorial argument. Of primary importance is the need to examine the entire context of the judicial proceeding. Thus, it is not our duty to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair. In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity. Finally, the giving of a curative instruction by the trial court may remedy effects of improper comments. *But see Houston v. Estelle,* 569 F.2d 372 (5th Cir.1978) (prosecutor's continuous use of shocking argument despite numerous sustained objections by defense counsel violated due process despite curative instruction).

While these principles are helpful, agreeing upon fundamental fairness as the relevant standard does not readily resolve particular cases. The *Donnelly* Court recog-

nized that "the process of constitutional line drawing in this regard is necessarily imprecise." 416 U.S. at 645, 94 S.Ct. at 1872. Fundamental fairness is itself but one of many verbal formulations of the scope of due process as guaranteed by the Fifth and Fourteenth Amendments to our Constitution. *See, e.g., Hobby v. United States,* — U.S. —, —, 104 S.Ct. 3093, 3096, 82 L.Ed.2d 260, 266 (1984) (discrimination in selection of grand jury foreperson does not "undermine the integrity of the indictment" so as to violate due process); *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980) (Alabama law precluding jury in capital case from receiving instruction on lesser-included offense violates due process because it "enhances the risk of an unwarranted conviction"); *Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952) (use of stomach pump to force production of concealed narcotics violates due process because it "shocks the conscience" and offends a "sense of justice"). An examination of a recent Supreme Court decision will provide additional guidance in ascertaining the appropriate standard of review.

### C. *Strickland v. Washington*

In *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court considered whether errors of defense counsel in representation at the sentencing phase of a capital trial were so egregious as to deny the defendant the effective assistance of counsel guaranteed by the Sixth Amendment.[25] The standard articulated requires a defendant to show (1) that errors of counsel were so serious as to be outside the broad range of effective assistance, and (2) that the errors were so serious "as to deprive the defendant of a fair trial." — U.S. at —, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. We believe that

---

**25.** While the case dealt specifically with errors by counsel at the capital sentencing stage, the Court made clear that the test to be applied should also be used in examining trial errors. *Strickland v. Washington,* — U.S. —, —, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

The application of a uniform standard recognized that capital sentencing, unlike ordinary sentencing, is a highly formal proceeding with an adversarial format and statutory standards for guiding the determination of punishment.

the Supreme Court's discussion of the second element, often called the "prejudice" requirement, is directly analogous to the fundamental fairness inquiry to be undertaken in cases where improper prosecutorial argument is at issue.

■ The court in *Strickland v. Washington* explained the prejudice requirement as follows:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

— U.S. at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Thus, errors, even serious errors, will not require reversal on a petition for writ of habeas corpus unless their absence would have, in reasonable probability, changed the outcome.

At first blush, the use of this standard to test the seriousness of prosecutorial argument may seem questionable. Federal courts conducting habeas review take special care to guard against a state infringement of protections specifically granted by the Bill of Rights, such as the right to counsel. *Donnelly v. DeChristoforo*, 416 U.S. at 643, 94 S.Ct. at 1871. Nevertheless, we find compelling reasons to support use of the "reasonable probability" test in the context of prosecutorial misconduct.

First, the court in *Strickland v. Washington*, while addressing a specific Sixth Amendment violation, recognized that "fundamental fairness is the central concern of the writ of habeas corpus." — U.S. at ——, 104 S.Ct. at 2070, 80 L.Ed.2d at 700. Discussing the application of the articulated test, Justice O'Connor wrote as follows:

> Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on

the fundamental fairness of the proceeding whose result is being challenged. *Id.* at ——, 80 L.Ed.2d at 699. Thus, the Court acknowledged that fundamental fairness, the same standard adopted in *Donnelly*, is the governing principle in reviewing errors of counsel. The use of the "reasonable probability" test to elaborate the underlying principle suggests its applicability to other areas in which fundamental fairness is the guide.

A second support for the *Strickland v. Washington* test is its analytic similarity to our review of prosecutorial argument. Not all errors of counsel require relief. A reviewing court must examine the errors, those "acts and omissions outside the wide range of professionally competent assistance," — U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695, and grant relief only when it is convinced that the requisite level of prejudice is reached. This is because "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." —— U.S. at ——, 104 S.Ct. at 2067, 80 L.Ed.2d at 696. Similarly, a prosecutor could make many improper arguments without rendering a trial or capital sentencing hearing fundamentally unfair. In each setting, the principal question for the court is when mere errors pass a threshold so as to create a constitutional violation.

The *Strickland v. Washington* test also commends itself because it is flexible enough to accommodate evaluations of constitutional errors of disparate magnitude. Application of the "reasonable probability" test can recognize that some errors are more serious than others in their tendency to "undermine confidence in the outcome." *Strickland v. Washington*, —— U.S. at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

Finally, asking whether the absence of improper argument would have, in reasonable probability, changed the result is consistent with the standards discussed in *Donnelly* and with subsequent cases applying the fundamental fairness standard. The several factors which those cases have found relevant operate in the same fashion

under the "reasonable probability" test. For example, the willingness to tolerate an isolated or ambiguous argument stems from a recognition of its minimal effect upon the jury. Another factor—the degree to which the challenged remarks have a tendency to mislead the jury and prejudice the accused, *Hance v. Zant*, 696 F.2d at 950 n. 7—is necessarily included within the reasonable probability test.[26] Even argument greatly exceeding the bounds of propriety will not be fundamentally unfair in the guilt phase [27] of a case with overwhelming evidence because of the low probability of the argument's impact. *See, e.g., Cobb v. Wainwright*, 609 F.2d 754 (5th Cir.) (given the strength of evidence against the defendant, the prosecutor's inflammatory argument did not render trial fundamentally unfair), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980); *Cronnon v. Alabama*, 587 F.2d 246 (5th Cir.) (improper argument not unconstitutional due to overwhelming evidence of guilt), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). On the other hand, arguments serious enough to satisfy the "reasonable probability" test have been found "fundamentally unfair" under the *Donnelly* standard. *See, e.g., Houston v. Estelle*, 569 F.2d 372 (5th Cir.1978) (repeated unsupported and inflammatory references to defendant as liar and dealer of drugs, and argument that defense counsel's objections and motions for mistrial evidenced desire to take case away from the jury, all over objection by defense counsel, so pervaded the trial as to be unconstitutional—even a curative instruction did not mitigate actual prejudice to defendant).

For all these reasons, we conclude that the *Strickland v. Washington* test, requiring an assessment of errors to determine whether there is a reasonable probability that they changed the outcome of a case, is applicable to our analysis of whether improper closing arguments delivered by the prosecuting attorney rendered the capital sentencing hearing fundamentally unfair.[28]

---

**26.** *Hance* also listed as a factor whether the remarks were deliberately or accidentally placed before the jury. 696 F.2d at 950. While that factor may be more clearly, or more frequently, relevant for a court with supervisory powers over the conduct of the prosecutor, there may be cases where the prosecutor's intentional conduct rises to a level equivalent to a knowing use of false evidence. *See Donnelly v. DeChristoforo*, 416 U.S. at 646, 94 S.Ct. at 1872, citing *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967).

**27.** *Hance v. Zant*, 696 F.2d at 950 n. 7, implied that overwhelming evidence of guilt should not contribute to a reviewing court's conclusion that improper prosecutorial argument did not affect the jury's decision in the penalty phase. It is true that guilt, by itself, does not justify the death penalty. A Georgia jury must, in addition, find at least one statutory aggravating circumstance and then exercise its broad discretion in deciding the life or death issue on the basis of all the relevant facts and circumstances of the case. On the other hand, if the evidence of the defendant's guilt were weak, it would clearly be appropriate for the jury and any reviewing court to consider same; an important aspect of jurisprudence in this area is to minimize the risk that an innocent person will be executed. Thus, the overwhelming evidence of guilt factor plays a role in the sentencing phase which is different from its role in the guilt phase.

A different, but related, factor is the strength of the prosecution case for death. This factor should be used only with great caution, keeping in mind that a Georgia jury retains unlimited discretion to grant mercy in even the most egregious cases. However, it is inevitable that our analysis of improper prosecutorial argument at the sentencing phase will necessarily be colored by the nature of the crime, the manner of its proof, the defendant's character and other relevant concerns indicating the degree to which the circumstances of the crime and defendant are egregious or mitigated. *See, e.g., Strickland v. Washington*, —— U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 699 (1984) ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). The "reasonable probability" test automatically subsumes this factor.

**28.** The Supreme Court's use of the "reasonable probability" test in *Strickland v. Washington*, a death penalty case, makes clear that it is consistent with the need for high reliability in imposition of the penalty. *See Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Justice Brennan's partial concurrence demonstrates that the application of the test in capital cases must be guided by that concern for reliability. —— U.S. at ——, 104 S.Ct. at 2073–75, 80 L.Ed.2d at 704–06.

## D. *Application of the Standard*

These guidelines for reviewing the effect of prosecutorial argument only come into play when an improper argument has been made. A permissible argument, no matter how "prejudicial" or "persuasive," can never be unconstitutional. Thus, a precondition to examining the probable effect of improper closing argument on the jury is an understanding of the scope of permissible prosecutorial argument. In the context of a trial on the issue of guilt, where the jury is asked to find facts beyond a reasonable doubt, case law is plentiful on subjects that should not be argued.[29]

In this case, however, we review closing argument in the sentencing phase of a capital trial.[30] Because the Georgia capital sentencing hearing has a different focus than a trial on guilt, we must examine its particular characteristics in order to determine the extent of proper prosecutorial argument. Then, we can examine the argument in this case to determine whether Whisnant exceeded those bounds. Because we find some of his arguments excessive, we must finally determine, in accord with the standard set out above, whether the improper segments were so egregious as to create a reasonable probability that the outcome was changed because of them.[31]

## III. DETERMINING THE SCOPE OF PERMISSIBLE PROSECUTORIAL ARGUMENT AT THE SENTENCING PHASE

In Georgia, as in other jurisdictions that impose the death penalty, a capital sentence is given only after a special hearing which follows a conviction for a death-eligible crime. Ga.Code Ann. § 17-10-2 (1982). The use of this "bifurcated procedure" for trial and sentencing in capital cases was first recommended by the drafters of the Model Penal Code as a means of keeping prejudicial evidence relevant only to sentencing, from influencing the jury prior to its adjudication of guilt. ALI, Model Penal Code § 201.6, comment 5, pp. 74-75 (Tentative. Draft No. 9, 1959). While the procedure has been explicitly approved by the Supreme Court, *see Gregg v. Georgia,* 428 U.S. 153, 190-92, 96 S.Ct. 2909, 2933-34, 49 L.Ed.2d 859 (1976), the precise nature of the capital sentencing determination has been the source of some controversy.[32] Because the appropriate

---

**29.** For example, an attorney should not hint that he has additional evidence which he has not produced. *United States v. Garza,* 608 F.2d 659 (5th Cir.1979). Nor should he argue facts not in evidence before the jury, *Conner v. State,* 251 Ga. 113, 303 S.E.2d 266, 276, *cert. denied,* —— U.S. ——, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983), unless the facts are within the common public knowledge. *Tenorio v. United States,* 390 F.2d 96, 99 (9th Cir.), *cert. denied,* 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145 (1968); ABA Standards for Criminal Justice 3-5.9 (2d ed. 1982) ("It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record whether at trial or on appeal, unless such facts are matters of common public knowledge based on ordinary human experience or matters of which the court may take judicial notice"). Nor should he affirmatively state his personal opinions or beliefs to the jury. *United States v. Morris,* 568 F.2d 396 (5th Cir.1978); ABA Code of Professional Responsibility, DR7-106(c). Such statements inject irrelevant and possibly prejudicial matter into a jury's deliberations and thereby impinge on the jury's duty to determine the facts relevant to the guilt of a defendant.

**30.** The panel did consider alleged prosecutorial misconduct during argument in the guilt phase of Brooks' trial and found that it did not rise to the level of fundamental unfairness. *Brooks v. Francis,* 716 F.2d 780, 787-88 (11th Cir.1983). We concur in the judgment and reasoning of the panel in that regard, and further find that any improprieties at the guilt phase did not affect the jury in its sentencing determination.

**31.** We find it helpful in this case to analyze the entire argument, note improper comments, and then undertake the inquiry required by the "reasonable probability" test. A court need not determine whether specific arguments are proper or improper if, taken as a whole, they would not require relief. *See Strickland v. Washington,* —— U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 699 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies").

**32.** *Compare Strickland v. Washington,* —— U.S. ——, ——, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 693 (1984) ("A capital sentencing proceeding like the one involved in this case, however, is

conception of the penalty phase determines the role of the sentencing jury, it also affects what may be legitimately argued to that jury by a prosecutor as grounds for imposing death.[33] In this section of the opinion, we will discuss the Georgia capital punishment scheme and the areas of argument relevant to it.

### A. General Considerations

Because death is qualitatively different from all other punishments, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). The consistent recognition of death as a special punishment has led courts to scrutinize carefully the procedures under which it is imposed. Those procedures must comport with the Eighth Amendment's prohibition against cruel and unusual punishments, which, in the capital sentencing context, requires that sentencing discretion "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). The quest for minimal risk does not, however, require perfection. *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978).

An initial concern in dealing with closing arguments in capital cases is the emotional fashion in which they are frequently delivered, both by prosecution and defense counsel. Indeed, Brooks suggests that the emotional character of the prosecutor's argument here contravenes the mandate of *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977), that the "decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *See also Hance v. Zant*, 696 F.2d 940, 952–53 (11th Cir.1983) ("This dramatic appeal to gut emotion has no place in the courtroom, especially in a case involving the penalty of death"). This claim warrants careful attention.

■ Georgia's capital punishment scheme—with its bifurcated trial, its requirement that the jury find at least one of the several statutory aggravating circumstances, its individualized determination of the life or death decision, and its mandatory appellate review—makes it possible to differentiate a particular case "in an objective, evenhanded, and substantially rational way from the many Georgia murder cases in which the death penalty may not be imposed," *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235, 251 (1983). But, while the statute may be an objective one, capital sentencing is still

sufficiently like a trial in its adversarial format and the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial—to insure that the adversarial testing process works to produce a just result under the standards governing decision.") (O'Connor, J., writing for majority), *with California v. Ramos*, 463 U.S. 992, ——, 103 S.Ct. 3446, 3456, 77 L.Ed.2d 1171, 1185 (1983) ("More to the point, however, is the fundamental difference between the nature of the guilt-innocence determination at issue in *Beck* and the nature of the life-death choice at the penalty phase.... In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar 'central issue' from which the jury's attention may be diverted") (O'Connor, J., writing for majority): *compare also Bullington v. Missouri*, 451 U.S. 430, 444, 101 S.Ct. 1852, 1861, 68 L.Ed.2d 270 (1981) (capital sentencing

like a trial for purposes of Double Jeopardy Clause) (Blackmun, J., writing for majority) *with Spaziano v. Florida*, —— U.S. ——, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (capital sentencing not like a trial for purposes of Sixth Amendment right to jury) (Blackmun, J., writing for majority). *See generally*, Weisberg, *Deregulating Death*, 1983 Sup.Ct.Rev. 305, 328–60.

**33.** It also affects what may be legitimately argued by defense counsel. Defense argument on topics irrelevant to the task of the sentencing jury can be objected to and validly excluded. *See, e.g., Horton v. State*, 249 Ga. 871, 295 S.E.2d 281 (1982) (excluding defense argument about physical effect of electrocution because of irrelevance and failure to introduce evidence), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 837, 74 L.Ed.2d 1030 (1983); *see also Lockett v. Ohio*, 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2964 n. 12, 57 L.Ed.2d 973 (1981).

an emotional issue. Necessarily it will always be so. *See Barclay v. Florida,* 463 U.S. 939, ——, 103 S.Ct. 3418, 3424, 77 L.Ed.2d 1134, 1144 (1983) ("It is entirely fitting for the moral, factual and legal judgment of judges and juries to play a meaningful role in sentencing"). "Reason" alone cannot adequately explain a jury's decision to grant mercy to a person convicted of a serious murder because of that person's youth or troubling personal problems. Nor can reason alone fully explain the reaction of a juror upon hearing the facts of a particular crime described in their specifically tragic detail. Empathy for a defendant's individual circumstance or revulsion at the moral affront of his crime, reactions accepted as bases for capital sentencing decisions, are not susceptible to full explanation without recourse to human emotion. Thus, the fact that an argument by a defense counsel or prosecutor has emotional overtones does not independently indict it as improper. *Tucker v. Zant,* 724 F.2d 882 (11th Cir.), *vacated for reh'g en banc,* 724 F.2d 898 (1984). *See Conner v. State,* 251 Ga. 113, 303 S.E.2d 266, 276, *cert. denied,* —— U.S. ——, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983). The propriety of argument rests primarily in the relation of its content to issues relevant to the sentencing jury's concern.[34]

### B. *Georgia's Sentencing Hearing*

In *Zant v. Stephens,* 250 Ga. 97, 297 S.E.2d 1 (1982), the Georgia Supreme Court, answering a question certified by the United States Supreme Court, outlined the "issue" before a Georgia capital sentencing jury. After a conviction of murder, a capital sentencing hearing may be held.

The jury hears evidence and argument and is then instructed about statutory aggravating circumstances. The court explained the process beyond this instruction as follows:

> The purpose of the statutory aggravating circumstances is to limit to a large degree, but not completely, the factfinder's discretion. Unless at least one of the ten statutory aggravating circumstances exist, the death penalty may not be imposed in any event. If there exists at least one statutory aggravating circumstance, the death penalty may be imposed but the factfinder has a discretion to decline to do so without giving any reason.... [Citations omitted]. In making the decision as to the penalty, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial. These circumstances relate both to the offense and the defendant.

297 S.E.2d at 3–4. The United States Supreme Court upheld the constitutionality of structuring the sentencing jury's discretion in such a manner. *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

This explanation demonstrates that the jury in the sentencing phase has two tasks. It must first determine whether the evidence supports the existence of at least one statutory aggravating circumstance. That determination must be made "beyond a reasonable doubt." Ga.Code Ann. § 17–10–30(c). If at least one aggravating circumstance is present, the jury must then examine factors relative "to the offense and the defendant" and exercise its discretion in choosing between death or life imprisonment.[35]

---

**34.** In concluding that emotion is both appropriate and inevitable, we need not address whether some case might present an argument which, although directed to a relevant sentencing concern, was delivered in such an excessive and intolerable manner that it effectively diverted the jury's attention from its proper function. This is not such a case.

**35.** In Georgia, the sentencing jury in the death phase is not required to limit its consideration

to statutory aggravating circumstances. Once the jury has found at least one statutory aggravating circumstance, "the case enters the area of the factfinder's discretion, in which *all* the facts and circumstances" are taken into consideration. *Zant v. Stephens,* 250 Ga. 97, 297 S.E.2d 1, 4 (1982) (emphasis added). The Supreme Court in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), recognized this fact and nonetheless approved the Georgia scheme. Thus, state law does not limit a Georgia prose-

In carrying out the first task, the issue before the jury is very clear. The statutory circumstances are elaborated such that they require findings of fact similar to those made by the jury in the guilt phase of the trial. *Conner v. State*, 303 S.E.2d at 274. The second task, exercise of discretion to impose punishment, is more amorphous. *California v. Ramos*, 463 U.S. 992, 999, 103 S.Ct. 3446, 3451, 77 L.Ed.2d 1171, 1185 (1983) ("once the jury finds that the defendant falls within the legislatively-defined category of persons eligible for the death penalty, ... [it] then is free to consider whether death is the appropriate punishment"); *Zant v. Stephens*, 462 U.S. at 878, 103 S.Ct. at 2743, 77 L.Ed.2d at 248 (upholding Georgia statute over defendant's contention that jury discretion is "unbridled" at the sentencing stage). Nevertheless, some description of the jury's discretionary choice of punishment is made possible by reference to case law outlining appropriate sentencing concerns.

 The subject most relevant to the choice of punishment is the broad class of information about the defendant, his character, and the circumstances of his offense made known to the jury throughout the bifurcated trial. Consideration of these factors is made necessary by the Eighth Amendment's requirement that capital sentencing be individualized. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). It is unconstitutional for a state to restrict the jury's consideration of any such individualized information that the defendant puts forth to mitigate the severity of his offense. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The Court's opinion in *Zant v. Stephens, supra,* made clear that, under the Georgia scheme, the jury can also consider reliable [36] aggravating evidence, even though it is not relevant to any statutory aggravating circumstance. Thus, with very few exceptions,[37] any information about the individual defendant and his offense may be properly considered by the jury.

 A line of cases has also made clear that the sentencing body may consider the future dangerousness of a particular defendant. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (approving Texas capital sentencing statute that requires a jury to find, before imposing death, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society");[38] *see also, California*

cutor to arguments relating strictly to the statutory aggravating circumstances. *Cf. Barclay v. Florida*, 463 U.S. 939, ——, 103 S.Ct. 3418, 3426, 77 L.Ed.2d 1134, 1147 (1983) ("Unlike the Georgia statute, however, Florida law requires the sentencer to balance statutory aggravating circumstances against all mitigating circumstances and does not permit non-statutory aggravating circumstances to enter into this weighing process").

**36.** In *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Court found a violation of due process in a Florida trial judge's use of confidential pre-sentencing reports as a basis for imposing the death penalty. Absent an opportunity to explain or deny information contained therein, a capital defendant would be subjected to punishment based upon possibly unreliable information insulated from the adversarial format of the sentencing hearing. Georgia requires advance notice to a defendant of evidence in aggravation of punishment, whether or not that evidence is focused on a statutory aggravating circumstance. Ga.Code Ann. § 17–10–2(a) (1982); *Fair v. State*, 245 Ga. 868, 268 S.E.2d 316, 319, *cert. denied*, 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250 (1980). This requirement promotes reliability by allowing the defendant time to prepare a defense to the prosecution's evidence.

**37.** For example, death could not be urged because of irrelevant or constitutionally impermissible individual factors such as race, religion, political belief, etc. *Zant v. Stephens*, 462 U.S. at 885, 103 S.Ct. at 2747, 77 L.Ed.2d at 255.

**38.** The future dangerousness of a particular defendant, and the prospects for his rehabilitation, are relevant to specific deterrence (*i.e.,* incapacitation of the defendant), which is a legitimate consideration in a capital sentencing proceeding. *Spaziano v. Florida*, —— U.S. ——, ——, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340, 353 (1984).

*v. Ramos*, 463 U.S. 992, 1002 n. 16, 103 S.Ct. 3446, 3453 n. 16, 77 L.Ed.2d 1171, 1181–83 (1983); *Barefoot v. Estelle*, 463 U.S. 880, 896–98, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090, 1106–07 (1983).

A third area of consideration is the accepted penological justifications for the use of death as a punishment. These general justifications are retribution and deterrence. *Gregg v. Georgia*, 428 U.S. 153, 184–87, 96 S.Ct. 2909, 2930–31, 49 L.Ed.2d 859 (1976). A Georgia jury is charged with implementing the state's capital punishment scheme in a particular case. It is hard to imagine a more reasonable approach to this task than consideration by the jury of whether or not imposition of the death penalty in the particular case will serve the accepted objectives of deterrence and retribution. *See Collins v. Francis*, 728 F.2d 1322 (11th Cir.1984). Translating facts into a penalty is an ethical operation requiring consideration of the accepted justifications of the particular punishment. *See Spaziano v. Florida*, —— U.S. ——, ——, 104 S.Ct. 3154, 3174, 82 L.Ed.2d 340, 366 (1984) ("in the final analysis, capital punishment rests on not a legal but an ethical judgment ...") (Stevens, J., dissenting).

Thus, jury consideration of the appropriateness of retribution in the particular case

is both proper and inevitable. Similarly, with respect to specific deterrence, the jury may appropriately consider whether a particular defendant is so likely to be dangerous in the future and so unlikely to be rehabilitated that incapacitation is warranted. *See Jurek v. Texas, supra.* Even general deterrence, while principally a concern for the legislature, *Spaziano v. Florida*, —— U.S. at ——, 104 S.Ct. at 3172, 82 L.Ed.2d at 354, can be considered in fixing a punishment. In deciding whether to impose the death penalty in a particular case, it is appropriate for a jury to consider whether or not the general deterrence purpose of the statute would be served thereby. *Collins v. Francis*, 728 F.2d 1322, 1339–40 (11th Cir.1984) (discussing Supreme Court precedent and concluding that the need for general deterrence is a constitutional sentencing consideration).[39] Georgia permits argument about these penological justifications. *Conner v. State*, 251 Ga. 113, 303 S.E.2d 266 (1983).[40] Such arguments are logically relevant to the jury's proper task. Neither reason nor precedent suggests that we should raise a constitutional barrier to such arguments.

### C. *Implications for Prosecutorial Argument*

The previous discussion of issues appropriately considered by the Georgia sentencing jury is necessarily general.

---

**39.** It has been argued that general deterrence is not appropriately part of a capital sentencing jury's decision on whether or not to impose death. Gillers, *Deciding Who Dies*, 129 U.Pa.L. Rev. 1, 46–56 (1980). The two related points to this argument are (1) that a sentence's deterrent effect is only proper as a legislative decision as to whether the penalty should be enacted and thus should not be reconsidered by a jury; and (2) that the notion of general deterrence is so inherently unprovable that its consideration injects an unreliable element into capital sentencing.

While *Gregg v. Georgia* does indicate that deterrence is an appropriate legislative concern, 428 U.S. at 184–87, 96 S.Ct. at 2930–31, there is no indication in cases since *Gregg* that it is improper for the jury or sentencing judge to consider it. Cases requiring that capital sentencing be "individualized," *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d

944 (1976), do not foreclose more general considerations. To the contrary, cases suggest that deterrence is an appropriate sentencing concern. *See Collins v. Francis*, 728 F.2d at 1339–40 (relying upon *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978)). *Gregg* recognized that deterrence may be a meaningful concept for some crimes and not for others. 428 U.S. at 185, 96 S.Ct. at 2930. A defendant should be entitled to have the jury consider an argument that imposing the death penalty in his case would not have a deterrent effect.

Concerning the inability to prove deterrence, the fact that the Supreme Court in *Gregg* accepted Georgia's legislative judgment that deterrence is meaningful demonstrates that the absence of conclusive support is not fatal. Once an aggravating circumstance has been found that renders a defendant death-eligible, the justification is an appropriate subject for the jury's decision on the correct penalty.

However, it provides a guideline for determining the scope of proper prosecutorial argument. With regard to the sentencing jury's first task, it would be improper for a prosecutor to urge the jury to find a statutory aggravating circumstance on any basis other than the relevant facts introduced in evidence and the proper inferences therefrom.[40] Concerning the exercise of discretion after an aggravating circumstance has been found, arguments outside the realm of recognized sentencing concerns—*e.g.,* we noted that the individual circumstances of the crime and defendant, future dangerousness, rehabilitation and penological justifications for the death penalty are within the realm of recognized sentencing concerns—run the risk of being improper because they urge death for possibly irrelevant reasons. Of course, not all improper arguments will rise to the level of fundamental unfairness. Similarly, an argument based on one of these core concerns may, under certain conditions, be improper in its mode of presentation to the jury.[41] The general standards are helpful, however, as a means of focusing counsel on the true task before the sentencing jury. That task is broad enough that much safe ground for argument is available.

We now examine Whisnant's argument during Brooks' sentencing in light of these guidelines.

## IV. PROPRIETY OF THE PROSECUTORIAL ARGUMENT IN THIS CASE

Brooks complains of 12 separate portions of the prosecutor's argument in the sentencing phase of this case. We discuss each seriatim.

1. Brooks first complains of Whisnant's brief expressions of his own personal belief in the death penalty. An attorney's personal opinions are irrelevant to the sentencing jury's task. *United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978).[42] We will consider the effect of these statements in Part V.

2. Following the initial expression of belief in the death penalty, Whisnant represented that the Georgia crime rate had gone up since 1964, the date of the last state execution. Brooks argues that this statement, along with the assertion that "we didn't have this kind of murder ... when we had captial punishment," was improper.

Whisnant's reference to the increasing crime rate concerned the need for deterrence. Although there was no record evidence on the crime rate, the reference was acceptable because the increase in crime is "within the common knowledge of all reasonable people." *Tenorio v. United States,* 390 F.2d 96, 99 (9th Cir.) (prosecutorial reference, in prosecution for importation of heroin, to "the destruction and the human waste which arises from the use of heroin" acceptable as common knowledge), *cert. denied,* 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145 (1968); *see Gregg v. Georgia,* 428 U.S. 153, 187 n. 34, 96 S.Ct. 2909, 2931 n. 34, 49 L.Ed.2d 859 (1976) (noting 123% increase in murders from 1964 to 1974). Thus, the mere reference to an increasing crime rate was not improper.

**40.** Whisnant's sentencing argument does not present this problem. The jury had already found facts at the guilt phase which were aggravating circumstances under Georgia law. *See supra* note 20.

**41.** For example, it would be improper for a prosecutor to argue about individual circumstances of the defendant contained in a presentence report which the defendant had not been able to examine. *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). And, it would obviously be improper for the prosecutor to make argument on valid subjects using facts not introduced in evidence before the jury. *United States v. Warren,* 550 F.2d 219, 229 (5th

Cir.1977) (conviction reversed because government argued important fact not in evidence), *cert. denied,* 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978); *Conner v. State,* 251 Ga. 113, 303 S.E.2d at 276 (1983) (wrong for prosecutor to "go outside the facts appearing in the case and lug in extraneous matters").

**42.** *See, also United States v. Herrera,* 531 F.2d 788, 790 (5th Cir.1976) (attorney may not give personal opinion about credibility of witnesses); *United States v. Lamerson,* 457 F.2d 371, 372 (5th Cir.1972) (prosecutor cannot imply that he would not have brought case if defendant were not guilty).

The more crucial claim is that there is no support for the part of the argument attributing the increase in crime to the absence of executions. There was no record evidence of the deterrent effect of capital punishment.

As we have noted in Part III.B. of this opinion, deterrence is a valid consideration of a sentencing jury in a capital case. Although the Supreme Court has recognized the inconclusive nature of the scholarly debate on the subject, it has also held that capital punishment has "little or no deterrent effect" on some murders while "undoubtedly" deterring other such crimes. *Gregg v. Georgia*, 428 U.S. 153, 185, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976). In addition to recognizing some causal link between the penalty and deterrence, the Court held that the general issue of deterrence was a complex factual issue best left for resolution by legislatures. It thus deferred to the Georgia legislature's decision that capital punishment is appropriate in some cases. *Id.* at 186, 96 S.Ct. at 2931. The prosecutor need not adduce evidence, therefore, to prove the link between death and deterrence. An argument such as the one made by Whisnant, urging the jurors to consider the deterrent effect of the penalty, is not improper.[43]

3. Whisnant discussed the victim by emphasizing her youth, attractiveness, and kind disposition. Brooks argues that these remarks were wholly irrelevant and highly prejudicial.

It would be clearly improper for a prosecutor to urge the imposition of death because of the race, religion, sex, or social status of the victim. Any reference to such potentially prejudicial characteristics must be undertaken only with the greatest of care and only when the reference is relevant to some legitimate issue in the case. Excessive focus on the characteristics of the victim, even if no explicit link is drawn between those factors and the punishment sought, may also be improper when the effect is to inject irrelevant considerations into the sentencing decision. *See, e.g., Vela v. Estelle*, 708 F.2d 954 (5th Cir.1983) (two witnesses, a well-known football player and the victim's widow, testified in great detail that murder victim was kind, inoffensive, a star athlete, a church usher and choir member, a social worker with underprivileged children of all races, a college student holding down two jobs, and the father of a three-year old child—when all such evidence was irrelevant to any issue and legally inadmissible; the failure of counsel to object contributed to a finding of ineffective assistance), *cert. denied*, —— U.S. ——, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984). While argument focusing on the victim can be dangerous, not all prosecutorial references to the victim are improper. The fact that there is a victim, and facts about the victim properly developed during the course of the trial, are not so far outside the realm of "circumstances of the crime" that mere mention will always be problematic. It is not necessary that the sentencing decision be made in a context in which the victim is a mere abstraction.

Here, Whisnant asked the jury to remember "the person who is not here ... Carol Jeannine Galloway." He then ticked off some personal attributes shown by the evidence, *i.e.*, that she was a pretty, 23-year old, unmarried woman living with her parents and that she was a considerate person of high morals. These comments did personalize the victim, but they were brief enough that we cannot conclude that they injected prejudicial or irrelevant material into the sentencing decision.

---

**43.** Similarly, because *Gregg* recognizes both the controversy over deterrence generally and the rationale's inapplicability to particular murders, defense counsel properly can question the rationale in argument before the sentencing jury. In this case, Brooks' counsel did argue that the death penalty did not deter and cited studies demonstrating the lack of a deterrent effect.

4. Whisnant also mentioned the Galloway family. By way of rebutting an attempted defense argument based on sympathy for Brooks' family, the prosecutor reminded the jury of the Galloway's tragedy and noted that "next week when it's Thanksgiving and they are sitting around the table, Carol Jeannine won't be there, and never will be there again." This true statement was no more than a compelling statement of the victim's death and its significance, relevant to the retributive function of the death penalty. It was proper.

■ 5. The discussion of the prosecutor's practice of seeking death only in a few cases during the past years was improper. That claim was unsupported in the evidence and, at best, irrelevant. *Conner v. State*, 303 S.E.2d at 276 ("The portion of the prosecutor's argument referring to his prior criminal experience and the frequency with which he had sought the death penalty was not supported by any evidence and, moreover, was not relevant to any issue in the case. The argument therefore was improper"). Furthermore, it improperly implied to the jury that the prosecutor's office had already made the careful judgment that this case, above most other murder cases, warranted the death penalty. In this respect, the argument is similar to a prosecutorial argument at trial to the effect that "we only prosecute the guilty." Such an argument is clearly improper because:

> The remark is, at the least, an effort to lead the jury to believe that the whole governmental establishment had already determined the appellant to be guilty on evidence not before them....[Citation omitted]. Or, arguably, that may be construed to mean that as a pre-trial administrative matter the defendant has been found guilty as charged else he would not have been prosecuted and that the administrative level determination is either binding upon the jury or else highly persuasive to it.

*Hall v. United States*, 419 F.2d 582, 587 (5th Cir.1969). Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required. This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint. The effect of this improper argument will be considered carefully in Part V of this Section.

■ 6. Brooks next complains that the prosecutor improperly diluted the jury's sense of responsibility by arguing that it would not be "responsible" for Brooks' death. Arguments that trivialize the task of a sentencing jury—for example, arguments suggesting that appellate courts will correct any errors—are barred under Georgia law. *Fleming v. State*, 240 Ga. 142, 240 S.E.2d 37 (1977). The prosecutor's reference to the role of other participants in the criminal justice system, *e.g.*, the investigating police, the grand jury, and the prosecutorial staff, according to Brooks' interpretation, was an attempt to undermine the jury's sole responsibility for the awesome life or death decision by suggesting that the decision was shared with others in the criminal justice system.

However, the more apparent purpose of Whisnant's argument was simply that Brooks himself was responsible for his plight. He argued that Brooks was a grown man, knew what he was doing on the day of the crime, and that Brooks himself—not the investigating police, the grand jury, the prosecutorial staff or the jury—was responsible for his punishment. Such an argument was not improper.

Although an attempt by the prosecutor to dilute a jury's sense of responsibility for deciding the case clearly would be improper, the best argument that Brooks can make here is that the challenged remarks are ambiguous.[44] The Supreme Court has

---

**44.** The interpretation suggested by Brooks, in addition to being speculative, is completely at odds with the thrust of Whisnant's argument which emphasized the seriousness of the jury's

directed, however, that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. at 647, 94 S.Ct. at 1873. Thus, we discount the improper interpretation urged by Brooks.

7. Whisnant argued that Brooks himself believed in the death penalty, as evidenced by the killing of Galloway, and noted that the victim did not have lawyers or a judge or any other procedural safeguards. Brooks asserts that this comment was an attempt to provoke a negative reaction against him merely because he was exercising the procedural rights to which he was entitled.

It is improper to urge that a criminal defendant's exercise of constitutional rights is a ground for discrediting his defense. *See, e.g., Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (Fifth Amendment right to remain silent at trial commands that prosecutor and judge not make adverse comment about defendant's exercise of the right). Similarly, it is wrong to imply that the system coddles criminals by providing them with more procedural protections than their victims. A capital sentencing jury's important deliberation should not be colored by such considerations.

Although the remarks, as interpreted in the manner urged by Brooks, clearly would be improper, the more obvious interpretation of the argument is not. Correctly anticipating a defense argument that the death penalty is bad,[45] Whisnant argued that Brooks himself believed in the death penalty. The thrust of the argument was that Brooks' execution of Galloway in a manner much more horrible than a procedurally proper, legal execution demonstrated Brooks' belief in the death penalty. Following the command of *Donnelly v. DeChristoforo*, 416 U.S. at 647, 94 S.Ct. at 1873, that "a court should not lightly infer that a prosecutor intended an ambiguous remark to have its most damaging meaning," we doubt that the jury understood the remark in the improper way suggested by Brooks.

8. Arguing against the wisdom of imposing a life sentence on Brooks, Whisnant focused on the future dangerousness of the defendant. He suggested that Brooks might kill a guard or a fellow prisoner. He even noted the possibility that he might escape and asked "Whose daughter will it be next time?" Similar remarks were part of an argument found fundamentally unfair by this court in *Hance v. Zant*, 696 F.2d 940 (11th Cir.1983). Although these arguments were dramatic, they were directly relevant to the consideration of whether Brooks would remain a threat to society.[46] Our discussion above demon-

task in making its life or death decision. The jury's responsibility was also made crystal clear by the defense counsel's argument, and, more importantly, by the trial court's instructions, which informed the jury that their decision to recommend mercy would result in life imprisonment for Brooks, but that if they recommended the death penalty, the court was required by law to sentence the defendant to death.

**45.** The defense argued, *inter alia*, the Biblical commandment: "Thou shalt not kill."

**46.** Brooks suggests that, future dangerousness aside, it is wrong to make an argument based on a speculative possibility of prison escape. In *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Supreme Court held that it was not improper to instruct the jury that the Governor could commute a sentence of life without parole given to a defendant in a capital case. The Court found that mention of commutation did not turn the sentencing into a speculative inquiry on whether the Governor would eventually release the defendant but instead invited "the jury to assess whether the defendant is someone whose probable future behavior makes it undesirable that he be permitted to return to society." 463 U.S. at ——, 103 S.Ct. at 3454, 77 L.Ed.2d at 1182. The prison escape argument likewise did not turn the sentencing into a decision on prison securi-

strates that such consideration is a proper element in the sentencing jury's decision. *See, e.g., Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). A legitimate future dangerousness argument is not rendered improper merely because the prosecutor refers to possible victims. In this case, the arguments about Brooks' future dangerousness were appropriate inferences from the record before the jury.

■■■ 9. It was clearly improper for Whisnant to argue that death should be imposed because it is cheaper than life imprisonment. The factual assertion was completely unsupported. More important, cost is not accepted as a legitimate justification for the death penalty. *See Gregg v. Georgia,* 428 U.S. at 187, 96 S.Ct. at 2931 (accepting deterrence and retribution as justifications for penalty). The jury cannot be exhorted to impose death for that reason. This improper argument will be analyzed further in Part V.

■■■ 10. Whisnant's lengthy discussion of the "war on crime" and his analogy of jurors to soldiers contains both proper and improper elements.

Discussion of crime in the Columbus community, well within the common knowledge of the jury, was appropriate as part of Whisnant's argument about the need for deterrence. The point of this discussion was driven home at the close of the "war on crime" speech when Whisnant returned to the following conclusion:

> You can bring back the death penalty and you can tell William Brooks, and you can tell every other criminal like him, that if you come to Columbus and Muscogee County, and you commit a crime, and it's one of those crimes that's punishable by death, and if the aggravating circum-

stances are there, you're going to get the electric chair. . . .

Arguments about general or special deterrence may be considered by the jury.

The reminder to the jury that "the buck stops with you today" was an appropriate reference to the fact that the jury must make the ultimate decision.

Finally, the analogy of the death penalty to killing in a war was appropriate insofar as it implied that imposing death, while difficult, is at times sanctioned by the state because of compelling reasons (national security or deterring crime). While the phrase "enemy of society" was harsh, we do not seriously fault its application to one whose crime is "so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg v. Georgia,* 428 U.S. at 184, 96 S.Ct. at 2931.

Our acceptance of part of this argument cannot blind us to its obvious faults. The principal fault of the analogy is that a capital sentencing jury under the Georgia statutory scheme is bound to exercise broad discretion in its determination of a just punishment. This discretion is simply not analogous to the role of a soldier who is ordered to kill the enemy. Using the soldier metaphor, and coupling it with a challenge to the jurors' patriotism—"When [the soldiers] did a good job of killing . . . , we decorated them and gave them citations"; "if we can send a 17-year old young man overseas to kill an enemy soldier, *is it asking too much* to ask you to go back and vote for the death penalty in this case against William Brooks"—misrepresents the task the jury is charged by law to carry out. *See, e.g., Viereck v. United States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943). The main thrust of death penalty jurisprudence since *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346

---

ty, but was part of an argument pointing out the potential for future danger. *See Redd v. State,* 242 Ga. 876, 252 S.E.2d 383 (not improper to argue for death sentence by claiming that defendant will have "another chance" to do harm

unless executed), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304 (1979). Although there was no record evidence concerning escape, the fact that escape is a possibility was within the common public knowledge.

(1972), has been the need for guided discretion in the sentencing body's individualized consideration of the capital defendant. *See, e.g., Zant v. Stephens, supra.* Conceiving of the jurors as soldiers undermines the crucial discretionary element required by the Eighth Amendment. Discussing the broad "criminal element" and then seeking death for Brooks because "he's a member of the criminal element" undermines the requirement that sentencing consideration be individualized by introducing the improper suggestion that Brooks be killed merely because he is a criminal. In these respects, the "war on crime" argument was improper. In Part V, we will consider factors that mitigated the argument and carefully weigh its impact on the jury.

11. Whisnant analogized Brooks to a "cancer on the body of society." While dramatic, the metaphor went directly to the appropriate concern for whether Brooks would continue to be a threat to society. The evidence before the jury supported Whisnant's assertion that he would be dangerous.

12. Finally, Whisnant described the facts as follows:

He was just walking along with a pistol in his pocket, and decided "well, I'll make a hustle," to use their language, his language.

Brooks claims this remark was a racial slur, the word "their" used to highlight the fact that he was black to the all-white jury.

Even if brief, use of race as a factor in closing argument obviously would be improper, *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2d Cir.1973), and would have great potential for preju-

dice. We conclude, however, that the challenged reference was not a racial slur. Witness Marvin Brown had testified that Brooks, in telling Marvin about the crime, had used the term "hustle" to indicate that he had robbed the victim. Thus, Whisnant's reference to "their language" was simply quoting Brown and, by implication, Brooks.

## V. WAS THE SENTENCING HEARING FUNDAMENTALLY UNFAIR?

In the preceding section we identified four troubling segments of Whisnant's argument—his expressions of personal belief in capital punishment, the discussion of the prosecutor's policy of rarely seeking the death penalty (the "prosecutorial expertise" argument), the claim that Brooks' death would save taxpayers money, and the "war on crime" speech.

To determine whether the improper arguments rendered the sentencing fundamentally unfair, we must evaluate whether there is a reasonable probability that, but for those arguments, the death verdict would not have been given. This inquiry involves an evaluation of the improper remarks in the context of the entire proceeding, pursuant to the standards described in Part II of the opinion. We first consider the severity of the improper arguments.

Of primary concern is the prosecutorial expertise argument. The argument improperly suggested that the prosecutor had canvassed all murder cases and selected this one as particularly deserving of the death penalty, thus infringing upon the jury's decisionmaking discretion and improperly invoking the prosecutorial mantle of authority.[47] Recognizing the significant potential for prejudice, we nevertheless

**47.** Although Whisnant's brief expressions of personal belief in the death penalty are improper for the same reason, *i.e.*, concern that statements by the prosecutor will carry additional weight with the jury, we believe that their effect was insignificant. The claim "I believe in the death penalty" added little to Whisnant's vociferous argument for capital punishment in the instant case. Furthermore, the fact that the Georgia legislature has enacted a capital sentencing statute speaks loudly and properly of the punishment's validity. Whisnant's brief statements merely echoed that accepted legislative judgment. While irrelevant, they were not prejudicial.

point to some mitigation of the adverse impact. The prosecutor did not simply state that he had selected this case from among the mass of cases; rather, he expressly laid out before the jury his reasons for selecting this case, *i.e.,* because the crime itself was horrible, because the evidence of guilt was overwhelming, and because Brooks could not be rehabilitated. Thus the prosecutor revealed to the jury the underlying facts on which his selection was made, and the jury could then determine for itself the validity of each underlying factor and the degree to which each factor indicated that death was appropriate.

The adverse impact of the argument was further alleviated by the repeated emphasis of the entire proceeding that the jury, and not the prosecutor or anyone else, was vested with the awesome decision as to whether Brooks should live or die. The thrust of Whisnant's argument itself was to this effect. At the beginning of his argument, he advised the jury that "you've got to decide what kind of punishment fits that crime, whether he gets life imprisonment, or death in the electric chair." Throughout, his argument was couched in terms of urging the jury to impose the death penalty, and at one point he advised the jury that the "buck stops with you today." He concluded his argument by asking the jury to go to the jury room, consider all the facts and circumstances of the case, and bring back a verdict that Brooks be put to death in the electric chair.

Counsel for Brooks also made it unmistakably clear to the jury that it had the sole responsibility for deciding whether Brooks should get life imprisonment or death. Specifically responding to the implication in Whisnant's argument that the grand jury, the prosecutor, the executioner and others shared responsibility with the jury, defense counsel pointed out: "None of those people that he named had the decisionmaking responsibility, only you twelve have that deci-

sionmaking responsibility, whether this man lives or this man dies." His argument began with the acknowledgement that the jurors had before them the hardest decision of their lives, and ended with a request that the jury impose life imprisonment.

Most importantly, the judge's instructions to the sentencing jury explicitly and unambiguously placed the sole responsibility on the jury. In the first paragraph, the judge charged "it is now your duty to make certain decisions that will affect the sentence." He then stated flatly that "if you recommend the death penalty, then the court is required by law to sentence the defendant to death.... On the other hand, you can see fit ... to recommend mercy for the defendant, if this should be your finding, then in that event the court is required by law to sentence the defendant to life imprisonment."

For the foregoing reasons, we are satisfied that the jury labored under no misperception as to its role; the jury clearly understood that it alone bore the responsibility for deciding whether Brooks should live or die.[48] We acknowledge, however, a lingering concern over whether the jury was influenced to some extent by the prosecutor's suggestion that he, based upon his wider knowledge of crimes committed in the county, had chosen this particular case as eligible for death.

The "war on crime" argument is also troubling. The improper aspect of the argument was the suggestion that the jurors should forego an individualized consideration of Brooks' case and instead choose execution merely because he was part of the broad "criminal element" terrorizing American society. Although the "war on crime" argument did contain references more appropriately focusing on the particular case before the jury, the fact that its improper suggestion was diametrically opposed to the requirement that capital sentencing be individualized demands careful

---

**48.** Our certainty on this point dispels any concern about whether the jury understood Whisnant's discussion of the grand jury, prosecutor, police department and judge as an attempt to dilute its sense of responsibility. *See* Part IV(6).

scrutiny to determine whether the jury correctly understood its sentencing duty.

The main thrust of Whisnant's argument was not to exhort the jury to impose the penalty merely because Brooks was a member of the criminal element. Whisnant expressly suggested to the jury that the death penalty should be imposed because the crime that Brooks committed was horrible, because the evidence of his guilt was overwhelming, because Brooks showed no remorse, and because there was no chance that Brooks could be rehabilitated. He reminded the jurors that they had indicated at voir dire that they could vote for the death penalty if the facts and circumstances of the case warranted it. Whisnant concluded his argument by saying "we're asking you again to go back to the jury room and to deliberate, and to talk about the facts and circumstances of this case."

Similarly, the closing argument for the defense revealed the inapplicability of Whisnant's "war on crime" analogy. The defense counsel pointed out that a soldier is not asked to make a decision, while the jury in this case was vested with the decisionmaking responsibility as to whether Brooks should live or die. The defense also argued that the evidence of guilt was not overwhelming, and pointed to the evidence of Brooks' harsh childhood as a possible explanation of why he may have gone astray.

Most importantly, the judge's instructions to the jury focused attention on the individualized facts and circumstances of the case. He charged that their first responsibility was to determine whether there were any aggravating or mitigating

circumstances, and then even if the jury found beyond a reasonable doubt that there were aggravating circumstances, the jury would have to decide whether to recommend a life sentence. The judge expressly charged the jury that, in arriving at its determination, it should consider all of the evidence received throughout both stages of the trial and all facts and circumstances in mitigation and aggravation.

We therefore conclude that the emphasis of the entire proceeding adequately insured that the jury would base its decision on a consideration of the individualized facts before it, and not on the basis of the inconsistent suggestion that mere membership in the broad criminal element merited execution.

Finally, the argument that an execution would save tax dollars was undeniably improper. Its potential effect was somewhat minimized by the brevity of the comment and by Whisnant's own tentativeness in asserting it.[49]

Although we cannot conclude that these few improper arguments had no prejudicial effect on the jury, we are satisfied that the prejudice was not severe.

The evidence that Brooks kidnapped, robbed, raped and killed Galloway was overwhelming.[50] The sentencing jury found that the murder was "outrageously or wantonly vile, horrible, or inhuman." Brooks' crime included armed robbery, kidnapping, rape, as well as murder; the murder was preceded by both physical and psychological abuse, and the victim was left to slowly bleed to death. While there

---

**49.** In Part IV(7) we declined to accept Brooks' interpretation of ambiguous remarks, which Brooks argued were an improper attempt to provoke a negative reaction to his exercise of his right to trial and other procedural safeguards. Even if the jury were aware of the improper interpretation, the brevity of the remarks, as well as the context, satisfies us that there was no improper influence on the jury.

**50.** In this case, there was overwhelming evidence that Brooks kidnapped, robbed, raped, and killed, and these include all of the elements of the several crimes except for intent to kill

and malice. There was very strong evidence of intent and malice, even though we have concluded in Section One of this opinion that we cannot conclude that there was overwhelming evidence of intent and malice. The prosecutor's errors are not harmless because of such evidence; even undisputed guilt is never sufficient, by itself, to justify death. However, an outcome based on weak evidence might be more likely to have been affected by errors than one based on a very strong case. *Strickland v. Washington,* —— U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *see* discussion at Part II.C., *supra,* n. 27.

was evidence in mitigation of the crime, in the nature of testimony that Brooks suffered a harsh childhood and frequent beatings by his step-father, we cannot conclude that the jury would view the evidence as commanding. Although the instant case is not among the most egregious cases in which the death penalty has been imposed, neither is it among the least egregious.

Considered in light of all facts and circumstances of the case, the improper arguments, most of which were mitigated by other arguments and instructions by the court, were not sufficient to undermine confidence in the outcome. We are satisfied that the death verdict here was imposed because of valid sentencing considerations, and we thus conclude that there is no reasonable probability that the prosecutorial misconduct changed the outcome. Brooks' sentencing phase was not fundamentally unfair.[51]

For the foregoing reasons, the district court correctly declined to grant the writ of habeas corpus on the ground of prosecutorial misconduct at the sentencing phase.

### SECTION THREE: CONCLUSION

For the reasons stated in Section One, the judgment of the district court in denying habeas corpus relief on the *Sandstrom* issue is REVERSED. The case is remanded to the district court with instructions to grant the writ of habeas corpus with respect to the malice murder conviction only, conditioned upon the state's affording Brooks a new trial.

For the reasons stated in Section Two, the judgment of the district court denying habeas corpus relief on the prosecutorial argument issue is AFFIRMED.

With respect to the other issues on appeal, we reinstate the panel opinion AFFIRMING the district court's denial of habeas corpus relief on each ground.

### APPENDIX A

### CHARGE OF THE COURT

Ladies and gentlemen of the jury, the Grand Jury of Muscogee County for the August term of 1977, found and returned into Court, this Bill of Indictment charging and accusing William Anthony Brooks with the offense of murder. The indictment says that the accused, in the County of Muscogee, in the State of Georgia, did on the 15th day of July, 1977, unlawfully, with malice aforethought, kill and murder one, Carol Jeannine Galloway, by then and there shooting her with a pistol, contrary to the laws of said State, the good order, the peace and the dignity thereof.

Now, Count Two of that indictment, ladies and gentlemen, says that the Grand Jurors aforesaid, on their oath aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse William Anthony Brooks with the offense of kidnapping, for this count of the indictment says that the accused, in the County of Muscogee, and State of Georgia, did on the 15th day of July, 1977, unlawfully abduct and steal away one, Carol Jeannine Galloway, and did hold the said Carol Jeannine Galloway against her will, without authority or warrant, and the said William Anthony Brooks did inflict bodily injury upon the said Carol Jeannine Galloway while holding her against her will and without authority, by raping and murdering her, contrary to the laws of said State, the good order, the peace and the dignity thereof.

Now, Count Three of that indictment, ladies and gentlemen, says that the Grand Jurors aforesaid, on their oaths aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse William Anthony Brooks with the offense of rape, for this count of the indictment says that the accused, in the County of Muscogee, and State of Georgia, did on the 15th day of

---

**51.** Our decision does not condone the improper arguments identified in this case; rather, we conclude only that they do not render the proceeding fundamentally unfair. A court with supervisory powers might well reverse convic- tions if such arguments persist, or pursue other sanctions to eliminate such improper conduct, especially in the sentencing phase of capital cases.

July, 1977, unlawfully have carnal knowledge of the person of Carol Jeannine Galloway, a female, forcibly and against her will, contrary to the laws of said State, the good order, the peace and the dignity thereof.

Count Four of that indictment, ladies and gentlemen, says that the Grand Jurors aforesaid, on their oath aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse William Anthony Brooks with the offense of armed robbery, for this count of the indictment says that the accused, in the County of Muscogee, and State of Georgia, did on the 15th day of July, 1977, unlawfully by the use of an offense weapon, to wit: a pistol, take from the possession and immediate presence of Carol Jeannine Galloway, with the intent to steal the same, twenty dollars in lawful money of the United States in the value of $20.00, and one 1977 model, yellow, two-door, Fiat automobile of the value of thirty-six hundred, twenty-eight dollars and sixty cents, contrary to the laws of said State, the good order, the peace and the dignity thereof.

Now, ladies and gentlemen, to that indictment, and to each count of the indictment, this defendant comes into Court, and enters his plea of not guilty. The indictment is not evidence, and it should not be considered as evidence by you. The indictment, together with the defendant's plea of not guilty, forms the issue that you, ladies and gentlemen, have been sworn and impaneled to try and to pass upon.

This defendant enters upon the trial of this case with the presumption of innocence in his favor, and that presumption remains with him and enshrouds him throughout the trial of this case, until and unless the State produces evidence in your presence and hearing sufficient to convince you of the guilt of the accused of the crime charged. The State makes the charge set out in each count of this criminal bill of indictment, and the burden rests upon the State to establish by proof the truth of every material allegation in the indictment beyond a reasonable doubt before a verdict of guilty would be authorized.

Now, ladies and gentlemen, a reasonable doubt means exactly what it says, it is a doubt that is founded upon reason, and it may grow out of the evidence, or want of evidence. And, while the law requires the State to prove the guilt of the accused of the crime charged beyond a reasonable doubt, yet the law does not require the State to prove the guilt of the accused to an absolute nor a mathematical certainty.

A reasonable doubt, ladies and gentlemen, is not a fanciful doubt, an imaginary doubt, a conjectural doubt, nor a speculative doubt, and neither does it mean a possibility that the defendant may be innocent. But, as I have stated to you, it is a doubt that is founded upon reason, and such a doubt that a conscientious juror would have who is honestly seeking the truth of this case, after thoroughly evaluating the evidence and the testimony, and a doubt that leaves your mind wavering and unsettled as to what the truth is. The object of all legal investigations, ladies and gentlemen, is the discovery of the truth.

Now, the credibility of the witnesses is a matter to be determined by you under the instructions of the Court. You are the sole and the exclusive judges of the credibility of the witnesses, and in determining the credibility of the witnesses, you may consider all the facts and all the circumstances of this case. The witnesses' manner of testifying, their intelligence, their means and opportunity for knowing the facts to which they have testified, the nature of the facts to which they have testified, the probability or improbability of their testimony, their interest, or want of interest, and also their personal credibility, insofar as the same may legitimately appear to you upon the trial of this case.

Now, ladies and gentlemen, should there appear to you to be a conflict between the testimony of the witnesses, it would be your duty, if you can, to reconcile that conflict so as to make every witness speak the truth, and so as to impute perjury to no witness. If, however, ladies and gentle-

men, you cannot thus reconcile it, then it would become your duty to believe that witness, or those witnesses, whom you think most entitled to credit and belief.

Now, ladies and gentlemen, criminal intent being an essential element of every crime, it is a question of fact to be determined by you whether such intent existed in the mind of this defendant at the time of the alleged crime. Intent can be established by evidence, but it must be evidence which will satisfy your minds beyond a reasonable doubt. Intent may be shown in many ways, ladies and gentlemen, provided you find that it existed from the evidence produced before you during this trial. It may be inferred from proven circumstances, or by acts and conduct of the defendant, or it may be presumed when it would be the natural and necessary consequence of that act. Stated simply in layman's language, ladies and gentlemen, criminal intent simply means the intent to commit an act which the laws of the State of Georgia prohibit and forbid.

Now, I instruct you, ladies and gentlemen, that testimony has been given by certain witnesses who in law are termed experts, and in this connection I instruct you that in cases such as this one being tried, the law permits the evidence of men expert in certain lines as to their opinions derived from their knowledge of particular matters, yet the ultimate weight which is to be given to the testimony of an expert witness is a question to be determined by you, ladies and gentlemen of this jury. In other words, ladies and gentlemen, the testimony of an expert, like that of any other witness, is to be received by you and given such weight as you think it is properly entitled to. You are not bound or concluded, ladies and gentlemen, by the opinion testimony of any witness, expert or otherwise.

Now, I instruct you that when witnesses appear and testify, they are presumed to speak the truth, and are to be believed by you unless impeached in some manner provided by law, or otherwise discredited in your judgment. A witness may be impeached by disproving the facts testified to by the witness, or by proofs of contradictory statements previously made by the witness on matters relevant to the witness' testimony and to this case. Statements made out of Court and not under oath are not evidence, but they are to be considered by you, ladies and gentlemen, on the question of impeachment, or discrediting the witness attacked. When the credibility of a witness is attacked, as by an effort to impeach him by any of the efforts the Court points out, then you, ladies and gentlemen, become the triers of the credibility of the witness sought to be impeached, and of the witness or witnesses by whose testimony the attack may be made. You are to weigh the opposing testimony, ladies and gentlemen, and at last say whether you will discredit the testimony of the witness sought to be impeached and consequently give credit to that introduced by way of impeachment, or whether you will discredit that introduced by way of impeachment, and credit the testimony of the witness attacked.

In other words, ladies and gentlemen, it is your exclusive province, under all the attendant circumstances of this case, to determine whether or not a witness has, or has not been successfully impeached, but where his unworthiness of credit is absolutely established in your minds, he ought not to be believed, and it would be your duty to disregard the testimony of that witness, unless it is corroborated, in which case you may believe the witness, it being a matter, of course, ladies and gentlemen, always for you to determine whether or not a witness has, or has not been in fact impeached. The credit to be given to witnesses' testimony where impeached for contradictory statements made out of Court shall be strictly for you, ladies and gentlemen, to determine.

Now, ladies and gentlemen, direct evidence is that which immediately points to the question at issue. Indirect or circumstantial evidence is that which only tends to establish the issue by proof of various facts, sustained by their consistency, the

hypothesis claimed. And, I instruct you that in order to warrant a conviction on circumstantial evidence, the proven facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.

Now, ladies and gentlemen, I instruct you that a person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears to you that there was no criminal scheme, or undertaking, or intention, or criminal negligence.

Now, ladies and gentlemen, there's another rule of law that I call your attention to, and that is the flight, if any, and similar acts, if proven, from which an inference of guilt may be drawn, and these may be considered by you. But flight, ladies and gentlemen, is subject to explanation. The weight to be given it, whether you, ladies and gentlemen, will draw an inference of consciousness of guilt from it or not is strictly a question that you must determine. It is for you, ladies and gentlemen, to determine whether there was flight, if such has been proven, and if so whether it was due to a sense of guilt or from some other reason, and if from some other reason, no inference hurtful or harmful to this defendant shall be drawn by you.

Now, ladies and gentlemen, the State contends, which the defendant denies, that the defendant made a statement amounting to a confession. It will be for you, ladies and gentlemen, to determine from the testimony whether or not this defendant made an admission amounting to a confession. You will determine that, ladies and gentlemen, from the testimony you have heard during the trial of this case. To make a confession admissible in evidence, it must have been freely and voluntarily made, without being induced by another by the slightest hope of benefit, or by the remotest fear of injury. And in order for you, ladies and gentlemen, to find any such statement to have been thus freely and voluntarily made, you must also determine that the accused fully understood his rights guaranteed to him by the Constitutions of the United States and the State of Georgia, that is, his right to remain silent, that he understood that anything he might say could be used in a Court of Law against him; that he understood that he had the right to say nothing that might in any way incriminate him; and that he had the right to have counsel of his choice, or one appointed by the State to advise with him prior to making any statement and during the making of any statement, and further, you must determine that the defendant understood these rights and intelligently waived them.

The law says that all admissions should be scanned with care, and confessions of guilt should be received with great caution. A confession alone, without corroboration, would not be sufficient in law upon which to base a conviction. Corroboration would be such facts and circumstances as in your mind would tend to connect the defendant with the crime as charged; proof of the corpus delicti beyond a reasonable doubt, that is ladies and gentlemen, that the crime itself was in fact committed, may be, but is not necessarily sufficient corroboration of a confession. The law does not fix the amount of corroboration necessary, you, ladies and gentlemen, are the judges of whether other evidence sufficiently corroborates a confession to justify a conviction. If you find there was a confession properly made, and corroborated by other evidence, the degree of proof necessary to convict is that you must be satisfied of the guilt of this accused beyond a reasonable doubt.

Now, ladies and gentlemen, this defendant is charged in this Bill of Indictment with multiple offenses, and I instruct you that in your deliberations you must make a determination of his guilt or innocence as to each count of the indictment independently and separately from the other counts of the indictment. In count one, ladies and gentlemen, this defendant is charged with the offense of murder. The law of the State of Georgia says that a person commits murder when he unlawfully and with malice aforethought, either ex-

press or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied, the law says, when no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

The law, ladies and gentlemen, presumes every homicide to be malicious until the contrary appears from circumstances of alleviation, excuse or justification, and it is incumbent upon the accused to make out such circumstances to your satisfaction unless they appear from the evidence produced against him.

I instruct you, ladies and gentlemen, that legal malice is not necessarily ill will or hatred, it is the unlawful intent to kill a human being without justification or mitigation, which intention, ladies and gentlemen, however, must exist at the time of the killing as alleged. Under the law it is the fixed and deliberate purpose in the mind of the slayer to unlawfully take away the life of a human being under circumstances that the law would neither mitigate, justify nor excuse. Under the law it is not necessary that it should exist for a considerable time; under the law if it should exist for just one moment, and if death should ensue in consequence of such fixed and deliberate purpose, the killing would be murder.

In legal contemplation, ladies and gentlemen, a person may form the intention of doing some act at a particular instant, commit the act, and regret it as soon as it is done.

Now, in count two, ladies and gentlemen, in this Bill of Indictment, this defendant is charged with the offense of kidnapping. The law of the State of Georgia says that a person commits kidnapping when he abducts or steals away any person without lawful authority or warrant, and holds such person against their will.

In count three of the indictment, ladies and gentlemen, this defendant is charged with the offense of rape, and the law of the State of Georgia says that a person commits rape when he has carnal knowledge of a female forcibly and against her will. Carnal knowledge and rape occurs when there is any penetration of the female sex organ by the male sex organ.

In count four of this Bill of Indictment, ladies and gentlemen, this defendant is charged with the offense of armed robbery. The law of the State of Georgia says that a person commits armed robbery when, with the intent to commit theft, he takes the property of another from the person or the immediate presence of another by use of an offensive weapon. The law further says, ladies and gentlemen, that the offense of robbery by intimidation shall be a lesser and included offense in the offense of armed robbery. And, the law says that a person commits robbery when, with the intent to commit theft, he takes the property of another from the person or the immediate presence of another, by intimidation, by the use of threat, or coercion, or by placing such person in fear of immediate serious bodily injury to himself or another. The offense of robbery by intimidation, ladies and gentlemen, is a lesser and included offense in the offense of armed robbery.

Now, ladies and gentlemen, as I have stated to you, you must make a determination of the guilt or innocence of the defendant on each count of the indictment separately and independently of the others.

If your verdict be identical as to all four counts of the indictment, then you may state, "We, the jury, find the defendant thus—" either guilty or not guilty, "on all four counts." If it be different as to one count, ladies and gentlemen, as distinguished from another count, then you must state how you find on this particular count.

Now, if you believe—after you have retired and selected a member of your body as foreman, and the instructions I give you apply separately to each count of the indictment, if you believe the defendant guilty of the offense as charged in that count of the indictment, and if you believe that beyond a reasonable doubt, then you would be autho-

rized to convict him, and in that event the form of your verdict would be, "We, the jury, find the defendant guilty."

Now, as to count four of the indictment, ladies and gentlemen, wherein this defendant is charged with the offense of armed robbery, if you determine that the defendant is not guilty of the offense of armed robbery as charged in the indictment, or if you entertain a reasonable doubt as to his guilt of that offense, then of course, you should acquit him. If you acquit him of the offense of armed robbery, then you would go further and consider whether—and determine whether or not the defendant is guilty of the offense of robbery by intimidation, which as I've stated to you is a lesser and included offense in the offense of armed robbery. Should you believe the defendant under those circumstances guilty of the offense of robbery by intimidation, and should you believe that beyond a reasonable doubt, then of course, as to that count the form of your verdict would be, "We, the jury, find the defendant guilty on count four of the offense of robbery by intimidation."

Now, ladies and gentlemen, should you believe the defendant is not guilty of any offense as charged in the counts of the indictment, in each count of this indictment, or should you entertain a reasonable doubt as to his guilt of the offense as charged in that count, then of course, it would be your duty to acquit him, and in that event the form of your verdict would be, "We, the jury, find the defendant not guilty."

I ask you to retire, and after you have unanimously agreed upon your verdict, ladies and gentlemen, enter it upon the back of the Bill of Indictment in the space that you will find there provided for that purpose and for your convenience, have your foreman to date it, and sign it, and return it into Court. If you need additional space on the back of the indictment other than the form I have suggested, you may use any available space on the back of the indictment.

Please retire at this time to the jury room, ladies and gentlemen.

JAMES C. HILL, Circuit Judge, specially concurring:

For the reasons stated in my concurrence in *Drake v. Kemp*, 762 F.2d 1449 (11th Cir.1985), I concur in the judgment of the court. I also observe that the jury instruction given in this case may well have violated *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), even without what I perceive to be the extension of that case accomplished by this court in *Davis v. Kemp*, 752 F.2d 1515, (11th Cir. 1985) (en banc), and by the Supreme Court in *Franklin v. Francis*, —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

As I now understand the law, I concur in the conclusion that the instruction was not harmless. I do so in spite of my appreciation of the wisdom of Judge Kravitch's dissent on this issue.

The dissent reasons that when one who has committed violent rape then produces a pistol, aims it at the victim and pulls back the hammer there can be no conclusion available but that, when the trigger is squeezed and the bullet from the pistol is propelled into the victim, the shooting was intentional. This reasoning is imbedded in the good sense that, long ago, led trial judges to tell juries that a person may be presumed to intend the natural consequences of his or her deliberate acts. Several decades of adroit "lawyering" have brought us to the point where that reasoning may no longer be permitted.

In this case, furthermore, we do not have just that evidence—producing, pointing and drawing back the hammer on the pistol prior to its discharge. The evidence which established that sequence of events, the petitioner's confession, brought with it petitioner's contention that, after the deliberate acts in preparation, an unintended accident intervened to cause the discharge. Thus, the words of the petitioner which established his deliberate acts upon which the conclusion of intentional shooting could be based contained also his assertion to the contrary.

Over the years, jurists have recognized that a conclusion of intent need not be drawn from deliberate acts if the contrary appeared from the evidence. Thus it was that instructions on this subject usually cautioned that the presumption "could be rebutted," need not be drawn if the defendant produces evidence to the contrary, or other admonitions to the same effect. Yet these were not entirely satisfactory. They implied that the burden shifted to the defendant to produce evidence to the contrary of the otherwise sensible conclusion. Evidence to the contrary might well appear in the prosecutor's case. The defendant is never required to produce evidence. Yet he has the right to do so. Therefore the jury should not be told that he *must* rebut; nor should his evidence, should he produce evidence, be excluded from the jury's consideration. *See generally* E. Cleary, *McCormick on Evidence* § 347 (1984).

This was resolved in the instruction so firmly—but, I submit, unwisely—condemned by our predecessor court in *Mann v. United States,* 319 F.2d 404 (5th Cir. 1963), *cert. denied,* 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474; *see United States v. Chiantese,* 560 F.2d 1244, 1256 (Hill, J. concurring specially). That instruction cautioned the jury that an inference of intent should not be drawn if "the contrary appears from the evidence." There was no burden upon anyone to produce evidence to the contrary. Any evidence properly admitted, with the defendant being under no duty to produce evidence but fully entitled to do so, might support a contention contrary to the conclusion.

Even in those days, before we began carving many facets on this stone, it would be seen that, in this case, evidence to the contrary of the conclusion of intent was produced, by the state, in the same confession which proved the facts upon which the conclusion might be based. The defendant's assertion of accidental discharge, after producing, aiming and cocking the loaded pistol, might have been a slender reed, but he was entitled to have the issue thus appearing resolved by the jury.

Judge Kravitch resolves it against the petitioner, presumably by reasoning, as so many other eminent jurists have reasoned, that a person may be presumed to intend the natural and probable consequences of his deliberate acts. If it is unconstitutional to permit a juror to do that, I conclude reluctantly that I may not.

I confess that I find the harm by applying the reasoning of the *Mann* instruction, and I acknowledge that the *Mann* instruction, and those like it, are now condemned. I apprehend that if the harm can be found in the reasoning of those instructions, it must *a fortiori* appear in today's jurisprudence.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I. The *Sandstrom* Issue

The majority holds that the jury instructions impermissibly shifted the burden of proof, violating Brooks' constitutional rights. I agree and concur in this portion of the opinion. The majority, however, then concludes that there was not overwhelming evidence of an intent to kill and that the error was not harmless beyond a reasonable doubt under the standards of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, it reverses the lower court's denial of habeas relief, thus requiring a new trial on the issue of guilt. I disagree with this holding.

As the majority states, in his confession Brooks admitted that he kidnapped the victim from her home and forced her to drive him to a secluded area where, at gunpoint, he made her disrobe and raped her. When the victim began screaming, Brooks aimed the gun at her *and pulled the hammer.* According to Brooks, "the gun went off." He fled, leaving his victim to bleed to death.

The majority, relying on language in *Davis v. Kemp,* 752 F.2d 1515 (1985) (*en banc*), indicating that the crucial inquiry in determining harmless error in the *Sandstrom* context is "intent," concludes that here the evidence of intent is not over-

whelming, since at trial Brooks never admitted that he intended to kill. I find this reasoning unpersuasive. Although the *Sandstrom* instruction related to the murder charge, the jury could not possibly have ignored the evidence that the appellant threatened the victim with a loaded pistol to accomplish the abduction and rape, but that not until she began screaming did he aim the pistol at her *and cock it*, or *"pull the hammer,"* a preliminary act to firing the weapon. This evidence, although circumstantial and based on Brooks' confession, nevertheless clearly implies that he pulled the hammer in order to fire the weapon.

The majority insists that I have "presumed intent to kill merely because of the 'natural and probable consequences' of Brooks' acts." *Ante*, at p. 1393. On this point, of course, the majority is correct: "intent," by its very nature, cannot be proven by direct evidence, unless the defendant expressly states his intent. The constitutional error in this case, however, lies *not* in the fact that the jury was *allowed* to presume Brooks' intent to kill; the Supreme Court has made it clear that permissive presumptions do *not* violate the Due Process Clause, except where they are patently unreasonable. *See Ulster County Court v. Allen*, 442 U.S. 140, 157, 99 S.Ct. 2213, 2224–25, 60 L.Ed.2d 777 (1979); *Francis v. Franklin*, —— U.S. ——, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985). Rather, the error here was that the jury was *compelled* to presume such intent, thus shifting the burden of proof to the defendant. In my opinion, this error was harmless beyond a reasonable doubt because, even absent such an instruction, it would have been impossible for a reasonable jury to have drawn any other inference but that Brooks intended to kill his victim.

This case stands in contrast to *Francis v. Franklin*, —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), in which the Supreme Court affirmed this court's ruling that a

*Sandstrom* error was not harmless. In *Franklin*, the defendant admitted that he fired the gun that killed the victim. The defendant testified, however, that the gun "went off" in response to the slamming of a door in the defendant's face, and that he never intended to fire the weapon. The tangible evidence corroborated the defendant's claim by establishing that the bullet travelled through the door before killing the victim.

In the instant case, as in *Franklin*, it is undisputed that the defendant fired the gun that killed the victim. All that is missing from Brooks' confession is the admission that he *intended* to pull the trigger. Such an explicit admission of intent is unnecessary. Brooks, unlike the defendant in *Franklin*, never claimed that the gun "went off" in response to a struggle or any other intervening physical event. In fact, Brooks did not even claim that the shooting was an "accident." Since guns simply do not "go off" by themselves, the only reasonable inference from the evidence is that Brooks did intend to pull the trigger. I have no doubt that the jury would have reached this conclusion with or without the *Sandstrom* charge.

*Lamb v. Jernigan*, 683 F.2d 1332 (11th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983), also involved a *Sandstrom* violation in a case of malice murder. There, this court discounted the appellant's claim of self-defense and found that, although the instruction was burden-shifting, it was harmless in view of the overwhelming evidence of guilt:[1] eleven stab wounds on the victim and no evidence of an assault on the defendant.

In my view, the evidence of guilt of malice murder in this case, including intent to kill, is equally as overwhelming as was that in *Lamb*. Had the trial judge here given a permissive charge, "you may presume," rather than the unconstitutional mandatory instruction given, I am convinced that the verdict would have been the same. Therefore, the error here meets the

---

**1.** Because in Georgia intent is an essential element of malice murder, evidence of guilt of the

charge of malice murder necessarily includes evidence of intent.

*Chapman* test that "beyond a reasonable doubt the error complained of did not contribute to the result obtained." I would affirm the district court's denial of habeas relief on this ground. Accordingly, I DISSENT from this portion of the majority opinion.

### II. Prosecutorial Misconduct

I join in the dissents of both Judges Clark and Johnson to Section Two of the majority opinion, relating to the prosecutor's improper closing remarks.

JOHNSON, Circuit Judge, dissenting:

### I. THE PROSECUTORIAL ARGUMENT CLAIM

The majority approves a prosecutorial argument similar to the one found "fundamentally unfair" in *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), noting simply, and without examination of that opinion, that "we ... overrul[e] any implications in *Hance* inconsistent with this opinion." Because it is not possible to reject the standards articulated in *Hance* without also abandoning the well-established constitutional principles from which they derive, I dissent.

### A. CONSTITUTIONAL FRAMEWORK

Our decisions concerning prosecutorial argument, like those concerning other features of the capital trial, have been informed by the conviction that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida*, 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). This difference has required protection, by means of procedural safeguards and continuing judicial vigilance, to assure that the imposition of the penalty is not the product of arbitrariness or caprice. *See, e.g., Zant v. Stevens*, 456 U.S. 410, 413, 102 S.Ct. 1856, 1857, 72 L.Ed.2d 222 (1982); *Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980); *Gardner v. Florida, supra*, 430 U.S. at 357–58, 97 S.Ct. at 1204–05; *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932–33, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 242, 92 S.Ct. 2726, 2728, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring).

To reduce the possibility of arbitrariness, courts have applied careful scrutiny to prosecutorial arguments which appeal to the emotions of the jury. An emotionally inflamed jury may not be able to weigh the relevant considerations with the care and deliberation demanded by the gravity of the penalty. Yet both the Supreme Court and members of this Court have recognized that some types of emotional response may be wholly appropriate to a capital sentencing proceeding. Because capital punishment may be understood as "an expression of society's moral outrage at particularly offensive conduct," *Gregg v. Georgia, supra*, 428 U.S. at 183, 96 S.Ct. at 2929–30, a response of fury or horror at the enormity of the defendant's crime is an acceptable, perhaps necessary part of the imposition of the death penalty. But this principle, too, must be qualified, because the retributive justification requires that the penalty be imposed only on those deserving of society's ultimate sanction, *see Gregg v. Georgia, supra*, 428 U.S. at 183–84 and n. 30, 96 S.Ct. at 2929–30 and n. 30. Outrage which is directed at the heinousness of the crime of murder in general, or at the danger that murderers as a group pose to society, is an impermissible basis for the imposition of the death penalty, as it "treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (striking down North Carolina mandatory death penalty statute for unconstitutional lack of individuation in application of penalty). *See also Enmund v. Florida*, 458 U.S. 782, 798–801, 102 S.Ct. 3368, 3377–79, 73 L.Ed.2d 1140 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978).

Thus the permissibility of a prosecutorial appeal to the emotions of a jury depends on the nature of the response which is evoked. Appeals which are supported by the evidence and relate to the circumstances of the case are permissible, for they incite only that acceptable form of outrage which responds to the defendant's crime. *See Cronnon v. Alabama,* 587 F.2d 246, 251 (5th Cir.), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979) (prosecutor's graphic description of murder and characterization of criminal permissible if evidence supports them). Arguments which lack support in the evidence, or seek to play upon the jury's undifferentiated fear or hatred of violence, are impermissible, as they encourage arbitrariness in the imposition of sanctions and preclude the individualized judgment required by the Constitution. *Cf. Houston v. Estelle,* 569 F.2d 372 (5th Cir.1978) (prosecutor's repeated unsupported references to defendant as liar and dealer of drugs impermissible).

The avoidance of arbitrariness in the jury's exercise of its discretion also requires that jurors be "confronted with the truly awesome responsibility of decreeing death for a fellow human...." *Lockett v. Ohio, supra,* 438 U.S. at 598, 98 S.Ct. at 2961. The Court addressed this requirement in its recent opinion in *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). While declining to hold unconstitutional an instruction informing the jury of the Governor's power to commute a death sentence, the Court emphasized the detrimental effect of the diminution of a jury's sense of responsibility for its decision: "advising jurors that a death verdict is theoretically modifiable ... may incline them to approach their sentencing decision with less appreciation for the gravity of their choice and for the moral responsibility reposed in them as sentencers ... [and] may operate to the defendant's distinct disadvantage." 463 U.S. at 1011, 103 S.Ct. at 3458. This detrimental impact is substantially increased when the invitation to jurors to ignore their responsibility is more open and explicit. The Geor-

gia Supreme Court recognized this principle in *Prevatte v. State,* 233 Ga. 929, 214 S.E.2d 365, when it held that statements from the court or prosecutor referring to the possibility of appeal were impermissible. The court concluded that the "inevitable effect" of such statements is to "encourage the jury to take less than full responsibility for their awesome task of determining life or death." 214 S.E.2d at 367. In accordance with this principle, courts of this Circuit have concluded that prosecutorial statements that encourage the jury to disregard its life or death responsibility or invite it to believe that the sentencing decision has already been made by more expert authorities are improper. *See Hall v. United States,* 419 F.2d 582, 587 (5th Cir.1969) (prosecutorial statements suggesting sentencing decision has already been made by authorities impermissible).

A third approach employed to channel the jury's discretion has been to limit its consideration to those matters brought out in evidence. This principle was unreservedly adopted by the former Fifth Circuit, which noted that "summation should not be used to put before the jury facts not actually presented in evidence." *United States v. Warren,* 550 F.2d 219, 229 (5th Cir.1977), *rev'd on other grounds,* 578 F.2d 1058 (5th Cir.1978) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). The Supreme Court has, moreover, declared that standards applied to the use of nonrecord information in capital sentencing should be stricter than those applied in other types of criminal sentencing. *Gardner v. Florida, supra.* In *Gardner* the Court held that a death sentence could not rest on non-record information which was not presented to the defendant and which he had no opportunity to rebut. The concern expressed by the Court about the "reliability" of such information is equally applicable to statements made by the prosecutor which lack any support in the record. On the basis of this concern, past decisions of this Circuit have held such statements to be improper.

Against the framework of constitutional principle on which decisions such as *Hance* have been built, we can more easily perceive the departure effected by the majority opinion.

### B. THE FRAMEWORK APPLIED

#### 1. The Standard of Review

The majority correctly identifies the proper standard of review as whether the concluding argument of the prosecution, taken as a whole, rendered the trial "so fundamentally unfair as to deny [the defendant] due process." *Hance* and the cases which followed it not only acknowledged the need to consider prosecutorial argument in the context of the entire trial, *Hance v. Zant, supra,* 696 F.2d at 950, but identified a range of factors which would make a prosecutorial comment more or less likely to affect the fairness of a trial. *Id.* at n. 7. That this standard requires the importation of the "reasonable probability" test from the distinguishable context of ineffective assistance of counsel, *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), has not been conclusively demonstrated.[1] But that question need not affect the disposition of this case. As an examination of the prosecutor's argument will make clear, there is at least a "reasonable probability" that, but for this improper argument, the result of the proceeding would have been different.

#### 2. The Prosecutorial Argument

The majority considers twelve instances of alleged misconduct in the prosecutor's argument and finds that only four—his expression of personal belief in the death penalty, his reference to the infrequency with which prosecutors seek the death pen-

alty, his claim that Brooks' execution would save taxpayers money, and his comparison of jurors to soldiers in a "war on crime"— were improper. The majority then concludes that in light of the broader context of the comments, the arguments of defense counsel and ameliorative instructions by the court, these improper comments were "not sufficient to undermine confidence in the outcome" and therefore not "fundamentally unfair" (Majority Opinion at p. 1416). The principles enunciated above, however, suggest that both the majority's evaluation of the individual comments and its conclusion concerning their cumulative effect on the jury are in error.

##### a. Prosecutor's Belief in the Death Penalty

The majority finds that this particular statement was improper because "[a]n attorney's personal opinions are irrelevant to the sentencing jury's task" (Majority Opinion at p. 1408). Yet this analysis substantially underestimates the impropriety of the comment. The more important reason that the statement is improper, as the majority admits parenthetically later in the opinion (Majority Opinion at 1404 n. 33), is that statements made by the prosecutor carry substantial, sometimes unwarranted weight with a jury. As the Supreme Court concluded in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the jury's confidence that "the obligations which so plainly rest upon the prosecuting attorney will be faithfully observed" leads jurors to accord his assertions, particularly those of personal knowledge, "much weight against the accused when they should properly

---

**1.** While the Court in *Washington v. Strickland, supra,* expressed a concern with the "fundamental fairness" of the proceeding similar to that articulated by the majority here, that opinion attempted primarily to define the command of the Sixth Amendment, a constitutional provision which is not at issue here. More importantly, the opinion made clear that in the context of both the Sixth Amendment and other provisions such as the Fourteenth Amendment which concern "fundamental fairness" to the defendant, prejudice is more likely to be pre-

sumed where the misconduct is perpetrated by the state or its attorney. *See, e.g., United States v. Cronic,* — U.S. —, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (state interference with assistance of counsel); *United States v. Giglio,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (state suppression of information concerning immunity for prosecution witness); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (state suppression of evidence favorable to accused).

carry none." It is for this reason that misconduct by a prosecuting attorney has been held to be a sufficient basis for reversing a conviction. *See Berger v. United States, supra.*

The majority concludes, however, that this particular statement provides no such ground, as its "effect was insignificant" (Majority Opinion at p. 1413). It argues that the prosecutor's statement merely echoes the judgment of the Georgia legislature that the punishment was valid. Yet it is unquestionably clear that the simple passage of a capital punishment statute by a state legislature does not remove from the minds of its citizens all doubts concerning the legitimacy of the punishment. If this were the case, the *voir dire* examination of potential capital jurors would hardly have assumed the significance it has in recent cases. *See, e.g., Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Jurors' doubts can be addressed and conceivably assuaged, particularly in the context of a specific case, by a public servant "whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States, supra,* 295 U.S. at 88, 55 S.Ct. at 633. The majority substantially underestimates the effect a prosecutor's endorsement of the death penalty can have on a jury.

b. Prosecutor's Reference to the Crime Rate and the Effect of Capital Punishment on It

The majority finds that the prosecutor's reference to an increase in the crime rate since the date of the last state execution and his statement that "we didn't have this kind of murder ... when we had capital punishment" is not improper. The opinion explains that the increasing crime rate was "within the common knowledge of all reasonable people" and was related to the question of deterrence; it states further that the possibility of a connection between the crime rate and the imposition of capital punishment has been acknowledged by the courts, which have left the matter to be resolved, as it evidently has been in the state of Georgia, by the state legislatures. Neither argument provides an adequate justification for permitting a reference which is so patently improper.

While the increase in the Georgia crime rate may be a matter of common knowledge, the putative connection between this reference and goal of deterrence raises a more difficult question. The nature of the connection acknowledged by the Court is, as the majority later concedes, "complex" and the scholarly debate on the matter is as yet "inconclusive" (Majority Opinion at 1409). Moreover, the passage of a capital punishment statute by the Georgia legislature does not necessarily represent that body's considered judgment on the deterrent effect of the penalty, as such passage may also be related to its retributive function. *See Gregg v. Georgia, supra,* 428 U.S. at 183–84, 96 S.Ct. at 2929–30. In light of these facts, a reference to the deterrent effect of the death penalty presents the jury with a "fact" which is neither on the record nor of established validity.

Even beyond the question of factual basis, the constitutional requirement of individuation imposes limits on the way a prosecutor may invoke the concept of deterrence. While he may remind the jury of the accepted penological justifications for the death penalty, deterrence and retribution, his comments must be directed toward the question of whether *under the circumstances of the particular case* the imposition of the death penalty would serve these objectives. *Cf. Spaziano v. Florida,* —— U.S. ——, ——, ——, 104 S.Ct. 3154, 3162–63, 82 L.Ed.2d 340 (1984) (sentencing must take into account not only valid penological objectives but facts and circumstances of individual and his crime). A statement that "we didn't have this kind of murder ... when we had capital punishment" has absolutely nothing to do with the circumstances of this individual case. It does not explain why this defendant's execution would serve the goal of deterrence, or why his crime is the appropriate object of society's ultimate retributive sanction. It is, in effect, an

invitation to jurors to impose the penalty as part of a "war on crime," an invitation which even the majority found improper and which will be considered later. For all of these reasons, the majority erred in condoning this prosecutorial reference.

### c. Prosecutor's Reference to Infrequency with which Prosecutors in His Office Seek Death Penalty

The majority finds that the prosecutor's statement that attorneys in his office had sought the death penalty less than a dozen times in the last seven years was improper because it led the jury to believe that a decision as to the appropriateness of capital punishment had already been made by officials more experienced than they, and reduced the sense of responsibility they felt in connection with that decision. But the majority concludes that this comment did not have a substantial prejudicial effect because: 1) the prosecutor referred to the factors which were behind the decision to seek the death penalty, so the jury could evaluate those factors for themselves 2) his argument in its entirety emphasized that the jury was the body vested with the responsibility for determining whether the defendant should die 3) the arguments of defense counsel and the jury instructions given by the court re-emphasized this responsibility. My own consideration of the record compels the conclusion that none of these factors ameliorated the harmful effects of the prosecutor's comment.

An enumeration of the factors which led the prosecutor to seek the death penalty might have been an ameliorating influence if it had been delivered in a manner which permitted the jury to draw its own conclusions regarding the appropriateness of the sentence. But this was not the case in the instant argument. The prosecutor preceded the elaboration of each factor with a pointed phrase such as "another thing *we consider before we come and ask you for the death penalty*," (emphasis added), which called the jury's attention not to the factor to be considered but to the fact that that element had already been weighed and

placed on the correct side of the ledger by a knowledgeable authority. The cumulative effect of these comments was to invite the jury to endorse the decision of the prosecutor's office, not to draw its own conclusion.

Nor did the prosecutor's references to the jury's responsibility vitiate the effect of this comment, for such references were fewer and less potent than the majority suggests. In the text of the prosecutor's closing argument there are only two clear references to the responsibility of the jury. The first of these references ("when I get back to that jury room, and we have to vote, and I vote to take somebody's life, can I do it?") comes immediately before the prosecutor's proclamation that only William Brooks should feel responsibility for his execution, which clearly undermines any feeling of responsibility induced by the preceding words. The other reference ("The buck stops with you today. And you can do something about it. You can bring back the death penalty and you can tell William Brooks ... [that] you're going to get the electric chair, that's what you can do.") comes in the midst of the prosecutor's invitation to the jury to wage a "war on crime." The import of this section of the prosecutor's argument is not that the jury has a *responsibility* to decide the *appropriate* penalty but that the jury has a *duty* to impose the *death penalty* —a message which is not notably different than that conveyed by the prosecutor's reference to the infrequency with which his office asks for the penalty. Neither of these references communicates a sense of responsibility sufficient to negate the ill effects of the prosecutor's comments concerning frequency.

Nor should we condone the impropriety of this argument because of statements later made by the court and by defense counsel. The majority overestimates the curative effect that such statements can have once the damage of an incontestably improper argument has been done. It has been the rule in this Circuit that ameliorative instructions do not cure prejudice to the defendant where unsupported or in-

flammatory references pervade a prosecutor's argument. *See Houston v. Estelle, supra.* Here the prosecutor's lengthy discussion of one of its rare decisions to seek the death penalty reminded the jury at numerous junctures that the decision facing them had already been made by more knowledgeable authorities. This constitutionally proscribed diminution of the jury's sense of responsibility cannot be overcome by a few brief comments by the defense attorney or the court.

d. Prosecutor's Statement that only Brooks was Responsible for his Execution

The majority accepts as proper the prosecutor's extended argument that William Brooks, rather than any of the legal decisionmakers who have confronted the case, is responsible for his execution. The opinion states that the import of this argument is ambiguous at best; and the most reasonable interpretation of the prosecutor's comments is that William Brooks is a grown man who is responsible for his actions and capable of suffering their consequences. Even the most cursory examination of the argument reveals that the majority has wholly mistaken its point.

The argument begins by evoking the doubts about assuming responsibility for the execution which must be going through the mind of each juror ("when we get back to the jury room ... and I vote to take somebody's life, can I do it?"). It then responds directly to this concern by denying any responsibility, either on the part of the jury or on the part of other law enforcement officials connected with the case ("the truth of the matter is, you're not taking his life, you're not pulling the switch in the electric chair; the police who investigated this case ... they're not taking his life; the Recorder's Court judge who heard the evidence in the preliminary hearing, are you going to say he's responsible ... of course not."). It also alludes to similar doubts that might have been in the mind of the prosecutor, and dispels the responsibility there as well ("How about me and my staff ... do we feel responsible? I don't. I don't think anyone in my office does."). Then, in the final sentences of the argument, in order to prevent the jury from seeing the execution as an effect without a cause, the prosecutor reveals that the party responsible for the execution is William Brooks himself ("if the switch is pulled and he's put to death, he pulled the switch the morning that he ... put the gun in the back of Carol Galloway"). The statement which the majority describes as conveying the main point of the argument ("He's a grown man and he knew what he was doing.") comes only at its very conclusion and has little to do with its primary focus.

Contrary to what the majority suggests, it would be hard to imagine an argument which is more carefully calculated to reduce that sense of responsibility which the Constitution requires in jurors contemplating the imposition of the death penalty. This is not an indirect reference to that responsibility, such as the Court approved in *California v. Ramos, supra;* nor is it even an invitation to share that responsibility with others, such as the Georgia Supreme Court struck down in *Prevatte v. State, supra.* It is an instruction to put away all thoughts of responsibility when considering the imposition of the penalty in this case. This type of reference cannot be labelled ambiguous or cured by a few words from the court. It is a reference which fundamentally affects the fairness of the entire trial.

e. Prosecutor's Discussion of the Future Dangerousness of the Defendant

The majority finds that the prosecutor's references to the danger that Brooks would pose to fellow prisoners, guards and other people's daughters were proper because they were appropriate inferences from the record and relevant to the important question of whether Brooks would pose a continued danger to society. A brief inspection of the prosecutor's argument on this point demonstrates that this is not the case. The "inquiry" into Brooks' future potential

for violence, which consists largely of personal opinions offered by the prosecutor ("I got whippings when I was a child, I thought my daddy used to beat me ... but that doesn't give me an excuse to go out and commit a crime."), is wholly separate from the prosecutor's reference to Brooks' danger to the prison population. More importantly, it discloses no information on the basis of which a juror could conclude that Brooks, as opposed to any other defendant convicted of murder, would pose a threat to the safety of those incarcerated with him. Though he stole a car as a "young child," Brooks has no past history of murder or any other violent crime. Nor does the prosecutor point to any testimony by criminologists or health care professionals which suggests that Brooks is more likely than other defendants to pose a threat in the future.

Given this record, it seems very unlikely that the prosecutor's comments were relevant to the type of inquiry that the Constitution permits: an inquiry into the dangerousness of a *particular defendant*. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Rather than helping the jury to evaluate the defendant as an individual, these comments encouraged the jury to view the defendant as indistinguishable from the entire universe of violent criminals, any one of whom has some incalculable potential to return to violence. The inflammatory terms in which these comments were offered ("It was Mrs. Galloway's daughter this time, Bobby Murray's girl friend; whose girl friend or daughter will it be next time ...?") also suggest that they were intended to appeal to the jury's generalized fear of violence. Far from being a permissible attempt to evaluate the defendant's future dangerousness, these comments reflect a concerted effort to deny him the individualized determination of the appropriate sanction that is required by the Constitution.

### f. Prosecutor's Invocation of the "War on Crime"

While the majority finds improper the prosecutor's extended metaphor comparing jurors to soldiers in a "war on crime," it concludes that the ill effects of the argument were mitigated by defense counsel's criticism of the metaphor and the court's references to the individualized circumstances of the case. Once again, the majority overestimates the curative impact of subsequent instructions.

Panels of this Circuit have, for a variety of reasons, found the "war on crime" to be among the most inflammatory and impermissible arguments that have been made by prosecutors seeking the death penalty. Not only does the characterization of the defendant as an anonymous member of the "criminal element" deprive him of the individualized consideration required prior to the imposition of the death penalty, but the suggestion that a "war" has been declared, and the attendant implication that jurors have a "duty" to fight it, removes from the jury the sense of responsibility for their decision that makes for an appropriately bounded exercise of their discretion. And the evocation of a pitched battle ("they're winning the war, is what's so bad, and if you don't believe they're winning, just look about you") encourages the jury to reach its decision in a frenzied and emotional atmosphere which invites arbitrariness in judgment.

These are not the types of effects which are likely to be dispelled by a brief word from the court or the defense attorney. Opposing counsel's criticism of the metaphor is likely to seem hopelessly abstract to a jury that has been goaded into a froth of patriotic duty. And the court's reference to the individualized circumstances of the crime is not likely to bear great weight in the minds of jurors who have just been reminded, at considerable length, of why it is appropriate to view the defendant as a faceless member of the "criminal element." When delivered at the length and with the fervor exhibited in this case, the "war on crime" is too damaging an argument to be cured by subsequent remarks. The importation of this argument into the sentencing phase of a capital trial drastically affects its fundamental fairness.

In at least six instances the prosecutor's argument created an atmosphere of unfocused emotion, relieved the jury of any sense of responsibility for its decision or deprived the petitioner of an individualized consideration of the appropriate penalty. In none of these instances were the damaging comments ameliorated by other portions of the prosecutor's argument or by comments from the court or defense counsel. One cannot but find a "reasonable probability" that these comments affected the outcome of the proceeding. By endorsing this prosecutorial misconduct, the majority signals its retreat from a carefully constructed framework of constitutional principles, designed to reduce the role of arbitrariness in capital sentencing.[2] It should, instead, have reversed the district court's decision on the prosecutorial argument issue.

CLARK, Circuit Judge, concurring in part and dissenting in part:

I concur in that part of the majority's opinion which holds that the instruction on malice given at Brook's trial placed upon him the initial burden of disproving malice in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and that the *Sandstrom* error was not harmless. However, I cannot agree with section two of the majority's opinion which holds that the prosecutor's closing argument at the penalty phase of Brook's trial did not render that proceeding fundamentally unfair.

In section two, the majority opinion begins by recognizing the inherent dangers in

improper arguments by prosecutors given the special role of the prosecutor in the criminal justice system. However, from that starting point the majority then adopts the prejudice standard of *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) to determine whether any particular argument made by a district attorney violates fundamental fairness. In my view, the majority's new standard is in conflict with existing Supreme Court precedent and the constitutional considerations underlying that precedent. Both policy, as well as the analogous precedent of Supreme Court decisions, require that a federal court on habeas corpus review first determine whether the argument has exceeded constitutional boundaries, i.e., did it render the proceeding fundamentally unfair. Although an unconstitutional closing argument may not require habeas corpus relief if the error is harmless, the burden of proof rests on the state, the beneficiary of the error, to show that the error was harmless beyond a reasonable doubt. In contrast, the *Strickland* standard adopted by the majority shifts the burden of proof to the defendant to show that the error affected the outcome in his case. This conclusion is erroneous.

I. *The Role of the Prosecutor*

In our adversary system the prosecutor plays a special role. The prosecutor is both an advocate and an administrator of justice. It is his or her duty not only to convict but to seek justice.[1] *See* A.B.A. Standards for Criminal Justice, 2nd Ed. (1982) § 3–1.1(b)(c); A.B.A. Code of Profes-

---

**2.** Even the majority opinion evinces discomfort with its suggestion that the prosecutor's arguments were harmless because of the "overwhelming guilt" of the defendant (Majority Opinion at 4480 n. 36). *Washington v. Strickland, supra,* suggests that where the evidence against a defendant is weak, errors by counsel may have a greater impact on the jury. But to transform that argument into a rule that where such evidence is strong, prejudice is difficult or impossible to establish, is tantamount to an assertion that those procedural protections required by the Constitution apply only to those against whom the evidence is scant.

**1.** Or as other courts have stated, a double standard does and should exist. *DiCarlo v. United States,* 6 F.2d 364, 368 (2d Cir.) *cert. denied,* 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925); *Filler v. U.S.,* 258 F. 567, 572 (2d Cir.1919). For example, the prosecution, is required to disclose exculpatory information to the defense pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). These restraints are based not only on the prosecution's duty to see that justice is done but also on a recognition that the power of the state is subject to abuse simply by virtue of its magnitude. Schwartz, *Limits of Prosecutorial Vindictiveness,* 69 Iowa L.Rev. 127, 159 (1983).

sional Responsibility, EC 7–3. As the Court said in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed.2d 655 (1935),

> "The [prosecutor] is the representative not of an ordinary party to a controversy but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done ...".

The prosecutor, therefore, wields the sword of justice. "It is his duty to recall that this sword, though forged in the flame heat of zeal is alloyed with the iron of restraint." *Houston v. Estelle,* 595 F.2d 372, 384 (5th Cir.1978). The reasons that restraint is required are obvious. The defendant, the accused, simply by being brought to trial is a vulnerable target. Second, prosecutors who deal in these matters daily should be expected to be more restrained by virtue of their experience. Third, the prosecutor is a state employee and this frequently creates in jurors a sense of trust and fairness in and by him. Alschuler, *Courtroom Misconduct by Prosecutors and Trial Judges,* 50 Tex.L. Rev. 629, 632 (1972). Jurors, in varying degrees, are predisposed to give great weight to the words of a prosecutor. *See Berger, supra,* 295 U.S. at 88, 55 S.Ct. at 633; *See also* A.B.A. Standards for Criminal Justice, § 3–5.8 (commentary). Therefore, a prosecutor should refrain from closing arguments calculated to inflame the passions of the jury or that serve to divert a jury from its duty to decide the case solely on the evidence. The prosecutor thus has a duty to guard the rights of the accused as well as those of society at large. A.B.A. Standards, § 3–5.8(c)(d). This is so because, "[s]ociety wins not only when the guilty are convicted but when criminal tri-

als are fair; our system of justice suffers when any accused is treated unfairly." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

Unfortunately, prosecutorial excess in closing argument is not an isolated or rare event. Judges and commentators bemoan its frequency but as of yet have had difficulty reducing it or offering useful suggestions for its reduction. *Courtroom Misconduct, supra,* 50 Tex.L.Rev. at 631. One former prosecutor and now a Florida state trial judge has said, "[p]rosecutorial misconduct in closing argument is increasing in frequency and appears to be perniciously resistant to eradication. Because of its potentially disastrous effects upon a criminal trial, it demands the attention of prosecutors and the defense bar alike." Defoor, *Prosecutorial Misconduct in Closing Argument,* 7 Nova L.Rev. 443 (1983).[2] With these considerations in mind, an analysis of what constitutes the proper inquiry and of the error of the majority opinion follows.

## II. *The Proper Inquiry*

It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process. *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *see also In Re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). This is a fundamental liberty secured by the Fourteenth Amendment. *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1961, 48 L.Ed.2d 126 (1976). As a result of this principle, any defendant in a criminal case has a right to an impartial dispassionate jury and a decision based solely upon the evidence developed at the trial. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). "This is true regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in

---

**2.** This is an opinion apparently acquiesced in by Justice Charles Weltner of the Georgia Supreme Court. In an article entitled "Vengeance" featured in the Atlanta Weekly Magazine on Sunday, January 6, 1985 he said:

> But there is a sense of combat that sometimes intrudes to overpower a sense of balance [in

cases involving horrible crimes], leading to what we call 'prosecutorial overkill'. When six solid items would be amply sufficient to assure conviction, a prosecutor drags up 20, many of which are questionable, thus inviting error and reversal. P. 13.

life which he occupies." *Id.*[3] *See also Chessman v. Teets,* 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253 (1957).

In order to secure this right, limitations are placed on the conduct of the state both before and during trial. The state for example has a duty to minimize the adverse affects of pretrial and trial publicity. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). A defendant generally cannot be forced to appear at trial in prison clothes and/or handcuffed. *Estelle v. Williams, supra; see also Boswell v. Alabama,* 537 F.2d 100 (5th Cir.1976). The prosecution cannot knowingly use false or perjured testimony to obtain a conviction. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). A defendant is entitled to an instruction on the presumption of innocence, *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), and he must be found guilty beyond a reasonable doubt. *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). And, as was stated earlier, the state cannot attempt to inflame or otherwise prejudice the jury in closing argument. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The purpose of all of these protections is to insure that a defendant's criminal trial comports with the fundamental fairness mandated by the due process clause.[4]

Due process is not a technical conception with a fixed content unrelated to time, place, and circumstances; it has never been and perhaps never can be precisely defined. *Lassiter v. Department of Social Services,* 452 U.S. 18, 25, 101 S.Ct. 2153, 2158–59, 68 L.Ed.2d 640 (1981). "Fundamental Fairness", as a by product of due process, is "a term whose meaning can be as opaque as its importance is lofty." *Id.* Therefore, fundamental fairness in a particular situa-

tion considers any relevant precedents and then assesses the interest at stake. 452 U.S. at 25, 101 S.Ct. at 2158–59. The Supreme Court has made clear that not every improper closing argument by a state prosecutor requires federal habeas corpus relief. The argument must constitute a "failure to observe the fundamental fairness essential to the very concept of ordered liberty" thus resulting in a denial of Fourteenth Amendment due process. *Donnelly, supra.* As the Court said in *Donnelly,* "the process of constitutional line drawing in this regard [of evaluating improper arguments by prosecutors] is necessarily imprecise." 416 U.S. at 645, 94 S.Ct. at 1872. This is a judgment to be made by the federal habeas court after reviewing the entire argument in the context of the trial or the sentencing proceeding. *Cronnon v. Alabama,* 587 F.2d 246 (5th Cir.) *cert. denied,* 404 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). The majority's search for a more precise standard is admirable. However, the result of that search places the burden of proof on the accused to show that the argument in question affected the outcome in his case. This results in virtually no restraints being placed upon the prosecution. The majority does not suggest how the accused could undertake such proof, and this writer cannot envision any methodology.

## A. *The Role of the Harmless Error Test*

Generally, once there has been a showing of a constitutional violation, a habeas corpus petitioner may still not be entitled to relief in some instances if the error was harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also United States v. Hastings,* 461 U.S. 499, 103 S.Ct. 1974, 1986, 76 L.Ed.2d 96 (1983) (Stevens, J., concurring). Some errors because of their importance, such as the complete denial of the right to counsel

---

**3.** As the Court said in *Sinclair v. United States,* 279 U.S. 749, 765, 49 S.Ct. 471, 73 L.Ed. 938 (1929); the "exercise of calm and informed judgment by its [jury's] members is essential to the proper enforcement of law."

**4.** For an analysis of the applicability of the due process clause of the Fourteenth Amendment to the penalty phase of a capital trial, *see* Note, *The Presumption of Life: A Starting Point For A Due Process Analysis of Capital Sentencing,* 94 Yale L.J. 351 (1984).

at a critical stage of a proceeding, can never be harmless. *United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657, 668, n. 25 (1984).

Other errors, however, can under certain circumstances be considered harmless. Those circumstances will vary depending on the nature and seriousness of the error, whether it was intentional or unintentional, and the extent to which a reviewing court can determine the impact of the error on the decision making body. In a harmless error inquiry, the Supreme Court has stated as the test:

> We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. State of Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171. There we said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id., at 86–87, 84 S.Ct. at 230.... Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on *someone other than the person prejudiced by it a burden to show that it was harmless.* It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy v. State of Connecticut* about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained....
>
> Applying the foregoing standard, we have no doubt that the error in these cases was not harmless to petitioners. To reach this conclusion one need only glance at the prosecutorial comments compiled from the record by petitioners' counsel and (with minor omissions) set forth in the Appendix.

*Chapman, supra,* 386 U.S. at 23–24, 87 S.Ct. at 827–828 (footnotes omitted) (emphasis added). *See also Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 975, 74 L.Ed.2d 823 (1983) (plurality opinion).

*Chapman* itself was a prosecutorial misconduct case. (comment by the prosecutor during closing argument on the defendant's failure to testify). The test articulated in *Strickland, supra,* cannot be invoked logically in a prosecutorial misconduct case. To do so is to place the burden of proof on the victim of the error to show that the prosecutor's argument affected his trial or sentencing hearing.

### B. *Strickland v. Washington*

In *Strickland* the Supreme Court held that in order to make out a sixth amendment claim of ineffective assistance of counsel a defendant must show that: (1) the errors complained of were outside the broad range of effective assistance, and; (2) that the errors prejudiced the defendant. In order to show prejudice, the "defendant must show that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different". 104 S.Ct. at 2064. The burden of proof is thus squarely on the defendant. Such a result makes sense in an ineffective assistance of counsel context. There, a petitioner is challenging the acts of his own counsel, i.e. his own agent. First, the role of one's attorney is to protect the interest of his client. Moreover, the client arguably has some control over the acts of counsel. Certain actions, as the Court recognized, may be the result of tactical decisions made either by the client or the lawyer, or both. *Id.* at 2068. Representation is frequently an art and what is reasonable in one case may be unreasonable in another. Therefore, reviewing courts are hesitant to second guess trial counsel. *Id.* Finally, *"the government is not responsible for* attorney errors in these *cases." Id.* at 2069 (emphasis added).

None of these considerations is applicable in a prosecutorial misconduct case!

The defendant in a criminal case has no control over the prosecutor. The prosecutor is not his representative but rather his adversary. An inflammatory or otherwise improper argument should never be a tactical decision. Finally, it is the state and no one else who is responsible for the error in question.

Furthermore, an alleged error in an ineffective assistance contest is easier to evaluate. The error has to do, for example, with the failure to investigate properly when such investigation would have uncovered favorable evidence. In such a situation a court can hear the evidence and assess its likely impact. Frequently, as well, the defendant knows what the complained of acts were and thus should have the burden of going forward and the burden of proof. In a prosecutorial misconduct case challenging the effect of a closing argument on a jury, the effects are subtle and difficult to evaluate and relate to the outcome of the case.

### C. *Prosecutorial Misconduct Revisited*

Any evaluation of a claim of prosecutorial misconduct is a two part inquiry. First comes an evaluation of the argument itself, i.e. did it render the trial or sentencing proceeding fundamentally unfair. If so, then comes the harmless error inquiry, i.e. can the state demonstrate beyond a reasonable doubt that "there is no reasonable possibility that the [argument] might have contributed to the" result of the proceeding.

The proper test for determining whether the argument was constitutionally improper should be: (1) was the prosecutor's argument an unintentional breach of the proper boundaries, or designed to induce a decision that was not based on a rational assessment of the evidence; (2) did the argument or type of argument tend to mislead or divert the jury; (3) was the remark(s) an isolated occurrence or were improper comments extensive throughout the argument; and (4) what was the nature of the decision to be made by the jury.[5]

Inquiring into the prosecutor's "design" is not necessarily a subjective test but one based upon an examination of the comments made in the context of the trial. This is a familiar principle in the law, i.e., a person intends the natural consequences of their acts.

The "tendency to mislead or divert" factor focuses on the inflammatory or improper nature of the particular statement used. For example: Was the statement based on facts not in the record? Was the prosecutor vouching for witnesses? Did the statement relate to an issue before the jury? And, what was the force of those statements in the particular case?

The factor of whether the remarks were isolated or extensive is concerned not necessarily with the quality of the excessive argument but with the quantity of improper statements. Finally, the nature of the decision to be made by the jury should be considered.

Is the jury's decision chiefly influenced by subjective or objective factors? Obviously, an improper prosecutorial argument is more apt to affect the jury's decision in a subjective decision than in an objective one. A verdict of guilt or innocence is based principally upon more objective factors. Accordingly, a jury is usually instructed not to be influenced by subjective factors, e.g. sympathy for the victim or the defendant, in making the guilt/innocence determination. The penalty phase of a capital trial is different in this regard, however. The issue is not whether the defendant was the culprit, but a far different determination of whether he should be executed. The jury's role in a capital sentencing proceeding is to focus on the nature of the crime, and the aggravating and mitigating circumstances in the particular individual's case being tried. The sentencing phase is not a twelve person referendum on whether the death penalty should or should not be imposed

---

**5.** This test is very similar to the one used by the panel in *Hance, supra,* 696 F.2d at 950, n. 7. Additionally, these factors are not necessarily a checklist but tools that a court should use in evaluating any particular argument.

generally, which was the thrust and intent of the prosecutor's argument in this case.[6]

The test stated above strikes a constitutionally appropriate balance between the conflicting interests at stake. The defendant has a right to a rational decision made by the jury regardless of the strength of the evidence against him. The prosecution has an interest in securing convictions and death penalties, but not in appealing to jurors' fears and prejudices through inflammatory arguments in order to secure convictions or death sentences. This is even more so because of the weight that a prosecutors' statements have with the jury. Statements that are reasonably intended to appeal to the juror's prejudices, fears, etc. should be presumed to do so unless the state can demonstrate otherwise. The judicial system has an interest in making sure that convictions and sentences are based upon a rational assessment of the presented evidence and not through a process distorted by prosecutorial excess. Fairness, as well as the appearance of fairness, is essential to the Fourteenth Amendment requirement of due process of law.

If the prosecutor makes improper arguments intended to preclude a decision based upon a rational assessment of the evidence, then the defendant has suffered prejudice rendering the trial or sentencing hearing fundamentally unfair and making it impossible to determine if the jury's decision was based on the evidence and the law, or the prejudice engendered by the prosecutor. The determination is made not by looking at isolated remarks, but by the argument as a whole in the context of the trial.

If it is determined that the proceeding was fundamentally unfair, then comes the harmless error inquiry. The use by the majority of the *Strickland* prejudice test in this context merges the harmless error inquiry into the evaluation of whether the argument was constitutionally improper. The majority states: "Thus, errors, even serious errors, will not require reversal on a petition for writ of habeas corpus unless their absence would have, in reasonable probability changed the outcome." Majority Opinion at 1401.

While in a harmless error test the strength of the evidence is a consideration[7] that determination and inquiry is made after the constitutional issue is decided. The majority opinion, engrafts this determination into the test of whether there has been a violation of fundamental fairness. "However, neither the fact that the crime was vile nor the amount of evidence against the defendant justifies vituperative argument by the prosecutor. Indeed, the greater the weight of the evidence and the more reprehensible the crime, the less necessity or justification is there for the prosecutor to inflame the jury." *Cronnon v. Alabama, supra,* 587 F.2d at 253 (Rubin, J., dissenting).

Further, the *Strickland* test shifts the burden of proof to the victim of the alleged misconduct rather than to the beneficiary of the error, the prosecution. This is contrary to the Supreme Court's decision in *Chapman v. California,* as quoted at 1434, *supra.* The beneficiary and perpetrator of the error should have the burden of proof. It is fundamentally unfair for the State to assert that although its agent, the prosecutor, breached all rules of court and law governing an argument, the defendant sentenced to die must prove he would have

---

**6.** The Georgia Supreme Court has emphasized that the sentencing phase not be influenced by passion, prejudice, or any other arbitrary factor given the nature of the decision. *See* O.C.G.A. § 17–10–35(c)(1) (On direct review the Georgia Supreme Court is to determine "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor."). *See also Zant v. Campbell,* 245 Ga. 368, 265 S.E.2d 22 (1980) (error for prosecutor to imply Georgia Supreme Court would approve death sentence in this case); *Fleming v.*

*State,* 240 Ga. 142, 240 S.E.2d 37 (1977) (error to suggest that death sentences are reviewed by the trial judge and state supreme court and can thus be set aside).

**7.** Because of the much more subjective nature of the life/death decision in a capital sentencing proceeding, strength of the evidence, even evidence supporting aggravating circumstances, is much less relevant than in a guilt/innocence determination.

received a life sentence but for the argument.

The *Strickland* test, by its nature, gives the cloak of constitutional approval to many improper prosecutorial actions. Although the result may in *some* cases be the same, it is different to say that no constitutional violation occurred, than it is to say that while there was a constitutional violation in this particular case it was harmless error. The first gives a stamp of acquiescence to the government action, the second disapproves of those actions but for certain legal and policy considerations finds that the error, although present, does not warrant reversal in that particular case. As one judge has said,

> "This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said that it would not reverse. Such an attitude of helpless piety is, I think undesirable.... If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it.... Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary." *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 661 (2d Cir.) (Frank, J., dissenting), *cert. denied*, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946).

This is a danger with harmless error as well, but not to the same degree. The Supreme Court recognized the danger in *Chapman, supra*, when it said, "harmless error can work very unfair and mischievous results when forbidden argument or evidence finds its way into a trial." 386 U.S. at 22, 87 S.Ct. at 827. This statement indicates that harmless error rule should be reluctantly used in a prosecutorial misconduct case. By necessity, it negates the use of the "prejudice" test adopted by the majority. Unfortunately, using the majority's approach the opposite is true, i.e. there is little room for a harmless error inquiry.

The *Strickland* test of "reasonable probability that the result of the proceeding would have been different", adopted by the majority, rules out the "reasonable possibility that the error might have contributed to the" result language in *Fahy*. The language in *Strickland* is so stringent that it severely limits a harmless error inquiry. *Fahy* and *Chapman* forbid such a limitation.

Finally, "effect on the proceedings" will miss the point in many cases. If a prosecutor has a strong case then he is given wider latitude to use improper arguments.[8] As the likelihood that the person will be sentenced to death increases, the likelihood that an egregious argument will warrant reversal decreases. Such a test does not hold the prosecution to a high enough standard. An argument by a prosecutor should be determined to be fundamentally unfair *vel non* without regard to the strength of the evidence against the accused either in the guilt/innocence phase or, as here, in the penalty phase of trial. The constitutional limitations on a prosecutor's conduct should not fluctuate with the strength of the case. To do so is to rob the term "fundamental fairness" of any meaningful content.[9]

In the final analysis, an argument that has been determined to be fundamentally

---

**8.** This is a very important consideration since, as it was noted above, *supra* p. 1432, n. 2, prosecutorial excess most frequently comes in cases where the crime is horrible and the evidence is strong. Thus, the majority's test has a heightened impact on our review of this type of claim.

**9.** Although this is a difficult matter to quantify, I also believe that the majority's new standard can only be perceived as a "relaxing" of the standard that federal habeas courts use to review claims of prosecutorial misconduct in closing argument. As was noted earlier in this opinion, *supra* pp. 1432–33, excess in closing argument is not an isolated or rare event. A new test that weakens our inquiry into claims of improper argument will only encourage more "improper" comments by district attorneys.

unfair in the penalty phase of a capital trial can seldom be harmless error. Due to the subjective nature of the life/death decision and the fact that no matter how "aggravated" the crime may be, the jury always has the option of returning a sentence of life imprisonment, a reviewing court can seldom say that there is no possibility that an unfair closing argument influenced the death penalty that was imposed. If the argument exceeded constitutional limitations, then the writ must in most cases issue.

With this two part inquiry in mind, an assessment of the prosecutor's argument in this case is appropriate.

III. *The Closing Argument in Context*

Considered as a whole, the argument in the penalty phase of Brooks' trial, from beginning to end, exceeded the outermost limits of a constitutionally permissible closing argument.

At the outset it should be emphasized again that the argument challenged in this case occurred at the penalty phase of Brook's capital trial. As the Supreme Court has noted, the consensus of their capital cases has been that "where discretion is afforded a sentencing body in a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited." *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983). The purpose of the penalty phase is to determine if death or life is the appropriate punishment in that case. *Lockett v. Ohio,* 438 U.S. 586, 601, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Improper argument by the prosecutor at the penalty phase "interjects irrelevant considerations into the fact finding process, diverting the jury's attention" from its proper focus, the characteristics of the individual and the offense. *See Beck v. Alabama,* 447 U.S. 625, 644, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Thus, such arguments increase the likelihood that a sentence of death will be arbitrary and capricious. Eliminating the risk of sentences imposed due to passion or prejudice has been the main thrust of the Supreme Court's death penal-ty decisions. *Zant, supra,* 103 S.Ct. at 2742. Therefore, any claim of prosecutorial misconduct in the penalty phase of a capital trial must be examined with these considerations in mind.

Shortly after he began his closing argument, the district attorney gave in no uncertain terms his own views on capital punishment:

Let me tell you here at the outset that I am for capital punishment. If you've got to take sides, I take the side of capital punishment. I believe in the death penalty. I think it is necessary.

The prosecutor's personal opinions on capital punishment, as well as any other matter, are obviously irrelevant. *See United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978). He then went on to support this view, especially the view that capital punishment deters, through non-documented assertions of matters that were not in the record:

I can tell you this; the last person in Georgia was electrocuted in 1964, and since that date crime has increased year by year, time after time, every time the statistics come out we have an increase in crime. We didn't have that when we had capital punishment, we didn't have this kind of murder, the kind of crimes you've heard about this week, when we had capital punishment, if they were they were very seldom, we heard about them somewhere else, but not around here.

These remarks were without any evidentiary support in the record. Furthermore, they misleadingly suggested to the jury that there is reliable evidence demonstrating the correlation between capital punishment and reduction in violent crime. As the Supreme Court noted in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) this assertion cannot be verified empirically. 428 U.S. at 184–85. Additionally, this statement is not relevant to either the character or the defendant or the circumstances of the crime, the relevant factors in a capital sentencing proceeding. The statements therefore diverted the jury from their proper focus. *See Lockett v.*

*Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

From this starting point the district attorney then proceeded to compare the qualities of the victim and her worth to her family to that of the petitioner.

Now, lets think about this, you have looked at William Anthony Brooks all week, he has been here been surrounded by his lawyers and you've seen him. Let's talk a minute about the person who is not here, about Carol Jeannine Galloway. What kind of person was she? We know that she was a pretty young lady, a beautiful young lady. We know that she was about 23 years old, she was not married, that she still lived with her mother and father, and we know that she was a person of high morals. We know that she was a considerate person. She went out picking up the garbage can to save her mother or father from having to do that. We know that she was a thoughtful person, she was going to treat her friend to breakfast before her friend left town.

So, when Mr. Araguel, or Mr. Sanders, whoever makes the argument on that side starts talking about William Brooks' life, and about William Brooks, about what a young person he is, his family, think about the Galloway family. Think about Carol Jeannine Galloway, who is not here in the courtroom today and who will never be here again.

Now, they are going to tell you, don't take William Brooks' life, locking him up is enough, don't put death on him, don't make his family go through with that. What has the Galloway family gone through. What have they gone through? Next week when it is Thanksgiving, and they are sitting around the table, Carol Jeannine won't be there, and never will be there again.

Again, these statements urged the jury to vote for the death penalty not because of any factor relating to Mr. Brooks' character or the facts of the offense but because Ms. Galloway was a thoughtful, considerate person who would be deeply missed by her family. This call for the death penalty due to the prominence of the victim in the community was not only irrelevant, but prejudicial to the defendant because it injected an arbitrary factor in the sentencing processing that could only mislead and divert the jury from its proper focus.[10] The jury was essentially being told to compare the relative worth of the victim and the defendant to society, i.e. the victim was more worthy and she was dead. The less worthy defendant, therefore, should also die.

Next, the prosecutor urged the jury that a sentence of death was appropriate in this case because his office had determined that this was one of the few murder cases for which the death penalty was the appropriate punishment. Stepping aside as the prosecuting attorney, he assumed what was in fact, the role of an expert witness:

Now, we don't ask for the death penalty—I have been district attorney for seven and one-half years, and we don't take this business of asking for the death penalty lightly. We don't come up here on every murder case that we try and say, "give the man the electric chair". In the seven and one-half years that I have been a district attorney, I believe that we have asked for it less than a dozen times, I think it is nearer eight or nine, but I know that it is less than twelve.

The prosecutor then described the process of how his office determined that a sentence of death was appropriate in this case. "Now what do we consider before we come to you and ask you to impose the death

---

**10.** *See for example Vela v. Estelle*, 708 F.2d 954, 966 (5th Cir.1983), *cert. denied, sub nom. McKaskle v. Vela*, —— U.S. ——, 104 S.Ct. 736, (1984) (district court's denial of habeas corpus relief reversed), "Faced with the task of assessing Vela's punishment, the jury was informed that the man he had killed was kind, inoffensive, a star athlete, an usher in his church, a member of his choir, a social worker with underprivileged children of all races.... The truth of these statements is, of course, not in issue; the point is that they are irrelevant to the severity of Vela's sentence and should not have been considered by the jury."

penalty? Well one of the things we consider are the facts of the case that is being tried." He then went on to describe the offense as follows:

> ... [H]e turns around and shoots her down like you would a dog, a stray dog. And, he didn't kill her, then, he said she was screaming and he shot her, and she fell, and was still trying to scream so he said in his statement, but the sound wouldn't come out and she bled to death, very slowly, drip by drip, drop by drop ... We wouldn't do that, as I said, to a stray animal that you wanted to get rid of, you wouldn't treat it like that.

The prosecutor went on to explain that, "another thing we consider before we come to you and ask for the death penalty is the proof in the case," he concluded by expressing his opinion that "I'm sure you agree with what I said this morning that the evidence against William Brooks is overwhelming ..." He then told the jury that "another thing that we consider before we ask for the death penalty, ... is rehabilitation," and that he had concluded that "there is no chance that William Anthony Brooks will ever be rehabilitated."

This series of statements was improper because it informed the jury that the district attorney's office, state officials with much experience in making these decisions, after reviewing all of the facts, had decided that William Brooks was one of the less than a dozen people found deserving of death in the last seven and one-half years. Instead of urging the jury to consider all relevant facts before making its choice, the district attorney essentially told the jury that the choice had already been made by

those who are experts in the field.[11] These remarks could only have been intended to reduce, and could only have had the effect of reducing in the jurors minds, the burden imposed by Georgia law on them, i.e., that they alone could choose between the sentence of life imprisonment or the death penalty.

In this same manner, the district attorney continued to urge the jury that it should not feel responsible if it voted for the death penalty.

> Now, I am sure that another question that might be going through your mind at this time is, when I get back to that jury room, and we have to vote, and I vote to take somebody's life, can I do it? I know it is rough, it would be hard for me to do. Can I take somebody's life? Well, the truth of the matter is you're not taking his life, you are not pulling the switch in the electric chair; the police who investigated this case and who apprehended William Brooks, they are not taking his life; the recorders court judge who heard the evidence in the preliminary hearing, are you going to say that he is responsible for taking his life? Of course not. How about the grand jury who listened to the evidence and indicted him for murder; are the grand jurors responsible for his life, can you say they are about to take his life? Of course not. How about me and my staff, we put the case together and we prosecuted him, and we are here now asking you to bring back the death penalty, do we feel responsible? I don't—I don't think anybody in my office does.

---

**11.** The reasons such arguments are improper were stated in *Hall v. United States,* 419 F.2d 582, 587 (5th Cir.1969) (conviction reversal because of prosecutorial misconduct). "The remark is at the least, an effort to lead the jury to believe that the whole governmental establishment had already determined appellant to be guilty on evidence not before them." (Citation omitted). "Or arguably, it may be construed to mean that as a pre-trial administrative matter the defendant has been found guilty as charged else he would not have been prosecuted, and that the administrative level determination is either binding upon the jury or else highly persuasive to it." Additional reasons for the impro-

priety of this type of argument can be found in *United States ex rel Clark v. Fike,* 538 F.2d 750 (7th Cir.1976) *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977) where the court held that it was wrong to suggest that a defendant is guilty because he is being prosecuted. In this situation it is wrong to suggest, as the prosecutor did, that the defendant deserves the death penalty just because the state is seeking it. Furthermore, the prosecutor failed to inform the jury that during four of his eight years as district attorney, 1972–1976, the constitutionality of Georgia's death penalty statute was very much in doubt.

How about the man, if he's electrocuted, who actually pulls the switch, is he responsible for taking his life? Of course not. The person who is responsible for his life is William Brooks himself, and if the switch is pulled and he's put to death, he pulled the switch the morning that he was walking along Saint Mary's Road when he put the gun in the back of Carol Jeannine Galloway and kidnapped her, that's when he took his own life. He's a grown man, and he knew what he was doing.

In Georgia, the jury is the final sentencing authority in a capital case. Arguments which trivialize this responsibility are inconsistent with the jury's role in a death case and are therefore improper.[12]

Next the prosecutor suggested that Mr. Brooks should be sentenced to death for exercising his right to stand trial.

Now I'm sure the argument is going to be made, either by Mr. Araguel, or maybe some member of the jury that, "Well the death penalty is bad, maybe we can do something else." Well let me say this to you; I told you I believe in it. William Brooks believes in the death penalty, he believes in executing people. He carried Carol Jeannine Galloway down in those woods out of the sight of everybody.

Carol Jeannine Galloway did not have a battery of lawyers around her, she didn't have a judge sitting there ruling on the evidence, she didn't get twenty strikes when the jury was selected, she didn't have any courtroom with cameras so that the whole record could see that she got a fair trial.

He just stepped back at point-blank range within three feet of her and killed her, shot her. So, he believes in the death penalty, he executed her, a lot more horrible than the electric chair which is a quick ...

These statements clearly urged the jury to punish Brooks for exercising his constitutional rights as well as his own "belief" in the death penalty. There also was the unmistakable implication that the system coddles criminals, at the expense of law abiding citizens, by giving them procedural protections. In the context of the numerous other comments made by the prosecutor that were an intentional effort to procure a decision that was not based on a rational assessment of the evidence, they can only be seen as improper. *See, e.g., Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (exercise of fifth amendment right to remain silent cannot be commented upon by prosecutor).

The prosecutor then urged the jury to consider the safety of prison guards and their families as well as other prisoners:

So, you put him in prison. How about those guards who have to guard him? They have families depending on them, how do you know that he won't kill one of them?

And, even worse than that, how about some young prisoner, or some other prisoner who is in prison with him, who is there trying to make his time, trying to be rehabilitated so he can go back to his family, back to society? He could kill him, kill a fellow prisoner.

He then went on to suggest that Mr. Brooks might escape and kill one of their loved ones:

How about if he escapes? And I'm sure they are going to say, "Oh, he couldn't escape". But, it was the early part of this year, or last year, I don't recall now, that a man escaped from a prison in Tennessee that no one had ever escaped from before. So, you always have the possibility that he might escape and might be out on the streets, and who knows who it will be next time, whose daughter will it be next time? It was Mrs. Galloway's daughter this time, Bobby Murray's girl friend? Whose girl friend or daughter will it be next time if he is out?

These remarks go far beyond the proper focus of a capital sentencing hearing. They serve only to fuel a jury's speculation about irrelevant matters, i.e. prison security and administration. In that respect, they divert the jury from the real task before them. Furthermore, these comments were not intended to help the jury make a rational assessment of the evidence. Rather, they were intended to in-

---

12. Similar arguments have been rejected by the Georgia Supreme Court as being inconsistent with the jury's role. *See e.g. Fleming v. State*, 240 Ga. 142, 240 S.E.2d 37 (1977). "The jury is given the heavy burden of making the decision of whether the defendant will live or die. Comments about appellate safeguards on the death penalty suggest to the jury that they can pass the responsibility for the death penalty on to this court." 240 Ga. at 146, 240 S.E.2d 37.

fluence them to make a decision based on fear; either fear for the life of the guards or prisoners, or fear for their own life or those of their families.

The prosecutor then appealed to the jury as taxpayers to impose death to save themselves the cost of housing and feeding another prisoner:

This is—I'm going to say this, and maybe you don't agree with me, and I'm sure that I will be accused of being materialistic in saying it, but why should—if he's given life, it costs money to keep him, thousands of dollars a year to keep a prisoner housed, feed and clothed, and medical care, why should the taxpayers, and that's you folks, all of us, why should the taxpayers have to keep somebody like William Brooks the rest of his life, ... why should we?

This argument like so many of the previous statements offered by the district attorney was completely irrelevant to the offense and to the offender. However, they provided a reason for the jury to vote for the death penalty, i.e. to ease their tax burdens. Such arguments are indefensible.[13]

The district attorney next turned to a line of discussion that is most easily classified as "The War on Crime" argument.

Let me say this to you, during my lifetime this country has been in three wars, each war we have taken our young men down to the age of 17, we've trained them, we've put guns in their hands, we've taught them how to kill the enemy and we've sent them overseas and they have killed other human beings who are enemies of our country, and when they did a good job of killing them, we decorated them and gave them citations, praised them for it. Well, I say to you that we are in a war again in this country, except it is not a foreign nation, its against the criminal element in this country, that's who we are at war with, and they are winning the war, is what's so bad, and if you don't believe they are winning, just look about you. You don't dare get out on the streets at night and walk around, you don't dare leave your house unlocked. In fact, most everybody I know has added more locks to their house, and burglar bars, and burglar alarms. And, we've got a man here in town who makes a living with guard

dogs, and, if you go to the hospital to see some of your friends, you've got to get by a security guard up there, and you see security guards everywhere. Why are they there? Because of the criminal element in this country. It's winning. And, if we can send a seventeen year old young man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case against William Brooks, and I submit to you that he is an enemy, and he's a member of the criminal element, and he's our enemy, and he's a enemy of the law abiding citizens and the people who want to live peacefully in this country, and who want to be secure in their persons and their homes.

You know, a lot of times you see people on the street, and they are always stopping us and saying, "You know, something has got to be done about this crime wave, what can we do, Mr. Whisnant: What can we do, Mr. Smith, we've got to do something about it." Well, you have an opportunity to do something about it right now. The police have investigated this case, we've prosecuted it the best we know how, and you are in the position of Harry Truman, who had on his desk a sign that said, "The buck stops here." The buck stops with you today. And you can do something about it. You can bring back the death penalty and you can tell William Brooks, and you can tell every other criminal like him, that if you come to Columbus and Muscogee County, and you commit a crime, and it's one of those crimes that is punishable by death, ... you are going to get the electric chair, that's what you can do. And I believe that that will stop some of the crime.... And, I submit to you that William Brooks is a cancer on the body of society, and if we're going to save society and save civilization, then we've got to remove them from society.

These remarks were clearly intended by the district attorney to place Mr. Brooks within a faceless undifferentiated mass of criminals, "a cancer on the body of society". Therefore, they were only intended to eliminate the possibility that the jury would base its decision upon the character of the individual defendant, Brooks, and the nature of his crime. The prosecutor urged

---

**13.** For examples of state court decisions condemning such arguments as indefensible, *see*

*State v. Jordan,* 294 Pac.2d 677 (Arz.1956); *Commonwealth v. Clark,* 185 Atl. 764 (Penn.1936).

the death penalty in order to send a message to the criminal element. It was further indicated to the jury that the only way they could save themselves in the ever escalating war on crime was to return a verdict of death in this case.[14]

Finally, just before resting, the prosecutor apparently appealed to the all white jury on racial grounds. Recounting a portion of Mr. Brooks' statement to the police, the district attorney remarked:

> ... he was just walking along with a pistol in his pocket and decided, "well, I'll make a hustle," to use their language, his language.

Despite the majority's contention, this remark can only be seen as a racial reference. Such remarks are clearly improper, *see United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2d Cir.1973), and were an attempt to subtly highlight the race of the defendant as a factor for the jury's decision. Such an argument has no place in any phase of a capital trial. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (race of defendant is improper as an aggravating circumstance).

### IV. *Conclusion*

Considering the argument as a whole, one inescapably concludes that the prosecutor's argument rendered the sentencing hearing fundamentally unfair. From beginning to end it was clearly designed not to suggest that the jury make a rational assessment of the evidence to or not to impose the death penalty but to render a decision based upon irrelevant and inflammatory suggestions appealing to their collective fears and biases. This is not a situation where the prosecutor made one potentially inflammatory remark in the course of an otherwise proper argument. Rather, this argument proceeded from one improper comment and statement to another. The statements consistently injected

highly misleading and/or improper considerations into the life/death decision before the jury. Any one, two, or more of these statements may not have rendered the penalty phase fundamentally unfair. The portions of the argument discussed in the previous section of this opinion constitute virtually the whole substance of the district attorney's statement at the penalty phase. (See the appendix to this opinion for the closing argument in full. The objectionable material comprises approximately eight of fourteen pages of the transcript.) This argument, therefore, could literally serve as a handbook on what prosecutors should not do. Furthermore, this argument occurred at the penalty phase of the trial. The life/death decision, because of its focus on the character of the defendant and thus its subjective nature, is easier to distort through misleading, improper and inflammatory statements. To hold this argument to be within the bounds of fundamental fairness is to concede that virtually any argument, no matter how vitriolic is permissible.

Finally, the constitutional error in this argument was not harmless.[15] The state has not shown beyond a reasonable doubt that the egregious argument had no effect on the sentence. The cumulative weight of the numerous improper statements made by the prosecutor here may well have tipped the scales in favor of the death penalty; certainly it cannot be said: there is "no reasonable possibility that the [argument] might have contributed to the" result.

## APPENDIX

### Closing Argument of District Attorney at Sentencing Phase

(Trial Transcript at 859–873)

MR. WHISNANT: May it please the Court, and you, ladies and gentlemen of the

---

**14.** These comments had even more effect on the jury due to an atmosphere of fear in the Columbus community resulting from the unsolved rape and strangulation of four highly respected older white residents of Columbus by the "silk stocking strangler" in the two months preceding trial. *See Viereck v. United States*, 318 U.S. 236, 247, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1942) ("At a time when passion and prejudice are heightened by emotions stired by participation in a great war, we do not doubt that these remarks ... were highly prejudicial."). These remarks were improper and made even more so by the partic-

ular attitude and fears in Columbus at the time of Mr. Brooks' trial.

**15.** In some cases in this procedural posture, it would be appropriate to remand the case to give the state the opportunity to meet its burden to show that the error was harmless. In this case, however, due to the egregiousness of the argument and the fact that this series of highly improper statements occurred at the penalty phase of Mr. Brooks' capital trial, such a showing could not be made and a remand is not necessary.

jury, I thank you again for your patience, and this is the last stage of the trial, this is the last time you'll have to hear me or Mr. Araguel talk to you. I know that you're tired of hearing us. But, this is an important part of the trial, just as important as the guilt or innocence stage of the trial, and we ask you to treat it as just as important as the first phase of the trial.

By your verdict, or at noon today, you have found this defendant guilty of murder, kidnapping, armed robbery and rape, and we're at the stage of the trial now where we fix his punishment, you fix his punishment, on the murder charge.

Punishment has a two-fold purpose, one purpose is to punish the guilty offender; the other purpose is to deter others of a like mind committing the same type of crime. In other words, if somebody else is thinking about murder, if you punish this man it's supposed to deter the other person from committing it. So that's the two-fold purpose of punishment.

Now, let me talk about the first phase of it, to punish the guilty. Punishment is supposed to be adequate and appropriate. In other words, the punishment is supposed to fit the crime, and the crime in this case is murder. He took the life of a person. So, you've got to decide what kind of punishment fits that crime, whether he gets life imprisonment, or death in the electric chair. And, we say in these circumstances that the only appropriate punishment is death in the electric chair. We're going to have some more to say about that before I sit down.

Now, I know you've heard discussions about the death penalty, you were asked numerous questions about it last Tuesday when we were trying to select a jury and you were prospective jurors. Let me tell you here at the outset that I am for capital punishment. If you've got to take sides, I take the side of capital punishment. I believe in the death penalty. I think it's necessary. And some people, I'm sure Mr. Araguel is going to tell you that there is no proof that the death penalty deters crime, you can't prove it. But, I can tell you this; the last person in Georgia was electrocuted in 1964, and since that date, crime has increased year by year, time after time, everytime the statistics come out, we have an increase in crime rate. We didn't have that when we had capital punishment. We didn't have this kind of murder, these kind of crimes you've heard about here this week, when we had capital punishment, if they were they were very seldom, we heard about them somewhere else, but not around here.

Now, let's think about this, you have looked at William Anthony Brooks all week, he's been here and been surrounded by his lawyers, and you've seen him. Let's talk a minute about the person who is not here, about Carol Jeannine Galloway. What kind of person was she? We know that she was a pretty young lady, a beautiful young lady. We know that she was about twenty-three years old, she was not married, that she still lived with her mother and father, and we know that she was a person of high morals. We know that she was a considerate person. She went out picking up the garbage can to save her mother or father from having to do that. We know that she was a thoughtful person, she was going to treat her friend to breakfast before her friend left town.

So, when Mr. Araguel, or Mr. Sanders, whoever makes the argument on that side, starts talking about William Brooks' life, and about William Brooks, about what a young person he is, his family, think about the Galloway family. And think about Carol Jeannine Galloway, who is not here in the Courtroom today, and who will never be here again.

Now, they're going to tell you, don't take William Brooks' life, locking him up is enough, don't put death on him, don't make his family go through with that. What has the Galloway family gone through, what have they gone through? Next week when it's Thanksgiving, and they are sitting around the table, Carol Jeannine won't be there, and never will be there again.

Now, we don't ask for the death penalty —I've been District Attorney for seven and a half years, and we don't take this business of asking for the death penalty lightly. We don't come up here on every murder case that we try and say, "Give the man the electric chair." In the seven and a half years I've been District Attorney, I believe we've only asked for it less than a dozen times, I think it's nearer eight or nine, but I know it's less than twelve. So, we take it seriously. We ask you to take it seriously. It is a serious matter.

Now, what do we consider before we come to you and ask you to impose the death penalty? Well, one of the things that we consider are the facts of the case

that's being tried. Was it a horrible crime that was committed? And let's stop there and look at the facts of this case, and look at what type of crime this was. Here was Carol Jeannine Galloway on a summer Friday morning, getting ready to go have breakfast with her friend, she sees a garbage can outside there and decides, "Well, I'll pick it up and put it up for my mother so she won't have to do it, or my father," whoever was going to pick it up. And, along comes William Anthony Brooks, probably never seen her before and didn't know her, but he had that pistol in his pocket, he puts it on her, makes her get into the car, drives her out there, takes her down into the woods, makes her take her clothes off, rapes her, and then after he's satisfied his lust, what does he do; he turns around and shoots her down like you would a dog, a stray dog. And, he didn't kill her then, he said she was screaming and he shot her, and she fell, and was still trying to scream, so he said in his statement, but the sound wouldn't come out, and she bled to death, very slowly, drip by drip, drop by drop. I pray that she was unconscious. That's the kind of condition he left that lady in. You wouldn't do that, as I said, to a stray animal that you wanted to get rid of, you wouldn't treat it like that. But, that's what William Brooks did to Carol Jeannine Galloway. If you sat down and tried to think up a horrible crime, could you think of anything more horrible than what you've heard here this week, that this defendant committed on this young lady? Could you think of anything more horrible?

All right, and another thing that we consider before we come to you and ask for the death penalty is the proof in the case, not that we just prove him guilty beyond a reasonable doubt and you find him guilty, but I mean, overwhelming proof, and you have that in this case. You've already found him guilty, and I'm sure you agree with what I said this morning that the evidence in this case against William Brooks is overwhelming, he did it, there's no question about it, and it was a horrible crime.

And, another thing that we consider before we ask for the death penalty, and I'm sure you're going to hear this from the defense, is rehabilitation. Is there any chance that the defendant might be rehabilitated? And we thought about that in this case. And, I submit to you that there's no chance that William Anthony Brooks will ever be rehabilitated. Let's look at what he did. He's been in trouble since he was a child. His own sisters told you that he was a car thief when he was a young child. And, they talked to you about him being beaten by his stepfather, but they never did say what his stepfather was beating him for, maybe he needed it. There's nothing wrong with whipping a child, some of them you have to whip harder than others. And there's been children who have been abused and beaten, but they don't turn to a life of crime on account of it. Goodness sakes, I got whippings when I was a child, I thought my daddy used to beat me, and he did, but that doesn't give me an excuse to go out and commit a crime. The fact that he got a beating when he was ten or eleven years old, does that give him the right to stop at somebody's house and put a gun in their back, and drive them down to the woods, strip them and rape them, and then after his lust is satisfied, murder them? That's what they want you to buy, that's what they want you to accept. Just because he got some severe whippings when he was a child, that you ought to forgive him for that, or that he ought to have a right to do something like that. Our society and our law was never designed to accept anything like that, and it's ridiculous, and I don't believe that you'll accept it, I don't believe that you'll buy it.

Now, I'm sure they're going to say, "He's a young person, just twenty-two years old, let him live." Well, he's no child, he's not fifteen, he's a grown man. Now, you can vote when you're eighteen years old, you can go in and buy a beer when you're eighteen years old, you can serve on the juries, have property in your name when you're eighteen. He's four years beyond that, he's a grown, mature man.

And, another thing, he is young, and if you look around and I'm sure you have, that's the group that's committing crimes in this country, are the young people, and if you don't punish young people, then you're not punishing the people who are committing the crimes. He's a mature man, and he doesn't deserve any credit or any sympathy from you just because he's twenty-two years old.

Now, I'm sure another question that might be going through your mind at this time is, when I get back to that jury room, and we have to vote, and I vote to take somebody's life, can I do it? I know it's

rough, it would be hard for me to do. Can I take somebody's life? Well, the truth of the matter is, you're not taking his life, you're not pulling the switch in the electric chair; the police who investigated this case and who apprehended William Brooks, they're not taking his life; the Recorder's Court Judge who heard the evidence in the preliminary hearing, are you going to say he's responsible for taking his life? Of course not. How about the Grand Jury who listened to the evidence and indicted him for murder; are the Grand Jurors responsible for his life, can you say they're about to take his life? Of course not. How about me and my staff, we put the case together and we prosecuted him, and we're here now asking you to bring back the death penalty, do we feel responsible? I don't. I don't think anybody in my office does.

How about the man, if he's electrocuted, who actually pulls the switch, is he responsible for taking his life? Of course not. The person who is responsible for his life is William Brooks himself, and if the switch is pulled and he's put to death, he pulled the switch the morning that he was walking along Saint Mary's Road when he put the gun in the back of Carol Jeannine Galloway and kidnapped her, that's when he took his own life. He's a grown man, and he knew what he was doing.

Now, I'm sure that argument is going to be made, either by Mr. Araguel, or maybe some member of the jury that, "Well, the death penalty is bad, maybe we can do something else." Well, let me say this to you; I told you I believe in it. William Brooks believes in the death penalty, he believes in executing people. He carried Carol Jeannine Galloway down in those woods out of sight of everybody. Carol Jeannine Galloway didn't have a battery of lawyers around her, she didn't have a judge sitting there ruling on evidence, she didn't get twenty strikes when the jury was selected, she didn't have any Courtroom with cameras so that the whole world could see that she got a fair trial. He just stepped back at point-blank range within three feet of her and killed her, shot her. So, he believes in the death penalty, he executed her, a lot more horrible than the electric chair which is a quick thing, brings death on real quickly. She lay there perhaps an hour and a half or two hours before she bled to death.

And then, somebody is going to say, "Can we sympathize, what about sympathy, can't we be sympathetic toward him?" The only answer to that is show him the same type of sympathy that he showed Carol Jeannine Galloway, the same sympathy that he showed her, left her laying there, after he had robbed her, taken her car, and satisfied his lust, he still killed her. Not one spark of sympathy, not one bit of sympathy did he show for her. His only thought then was to get away, and he did get away. He got his shoes muddy, and went and bought him some new shoes with the money he took off her. No remorse at all. So, he has no sympathy due him, and we ask you not to show him any.

All right, I'm sure that the defense is going to make this argument to you, we don't have to take his life, you don't have to take his life, just lock him up, put him away somewhere where he'll never be in society again, where he'll never harm anybody again, that's punishment enough, spare his life, just put him away forever. Let's think about that. Going back to what I said a while ago, the first thing is you've got to give appropriate punishment to fit the crime, and letting him live is not appropriate for the crimes that he committed, that's the first thing. And the next thing is, he has demonstrated that he's a killer. Anybody who can kill a poor defenseless person, or murder a poor defenseless person like he did will kill again. He doesn't care, life doesn't mean anything to him. So, you put him in prison. How about those guards that have to guard him? They have families depending on them, how do you know he won't kill one of them?

And, even worse than that, how about some young prisoner, or some other prisoner who is in prison with him, who is there trying to make his time, trying to be rehabilitated so he can go back to his family, back to society? He could kill him, kill a fellow prisoner.

How about if he escapes? And, I'm sure they're going to say, "Oh, he couldn't escape." But, it was the early part of this year, or late last year, I don't recall now, that a man escaped from a prison in Tennessee that no one had ever escaped from before. So, you've always got the possibility that he might escape and be out on the streets, and who knows who it will be next time, whose daughter will it be next time? It was Mrs. Galloway's daughter this time,

Bobby Murray's girl friend; whose girl friend or daughter will it be next time if he's out?

And this is—I'm going to say this, and maybe you don't agree with me, and I'm sure I'll be accused of being materialistic in saying it, but why should—if he's given life, it costs money to keep him, thousands of dollars a year to keep a prisoner housed, fed and clothed, and medical care, why should the taxpayers, and that's you folks, all of us, why should the taxpayers have to keep up somebody like William Brooks the rest of his life, when he's done what he's done? Why should we?

Let me say this to you, during my lifetime this country has been in three wars, each war we've taken our young men down to the age of seventeen, we've trained them, we've put guns in their hands, we've taught them how to kill the enemy and we've sent them overseas, and they have killed other human beings who were enemies of our country, and when they did a good job of killing them, we decorated them and gave them citations, praised them for it.

Well, I say to you that we're in a war again in this country, except it's not a foreign nation, it's against the criminal element in this country, that's who we are at war with, and they're winning the war, is what's so bad, and if you don't believe they're winning, just look about you. You don't dare get out on the streets at night and walk around, you don't dare leave your house unlocked. In fact, most everybody I know has added more locks to their house, and burglar bars, and burglar alarms. And, we've got a man here in town who makes a living with guard dogs. And, if you go to the hospital to see some of your friends, you've got to get by a security place up there, and you see security guards everywhere. Why are they there? Because of the criminal element in this country. It's winning.

And, if we can send a 17-year-old young man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case against William Brooks, and I submit to you that he's an enemy, and he's a member of the criminal element, and he's our enemy, and he's an enemy of the law-abiding citizens and the people who want to live peacefully in this country, and who want to be secure in their persons and their homes.

You know, lot of times you see people on the street, and they are always stopping us and saying, "You know, something's got to be done about this crime wave, what can we do, Mr. Whisnant; what can we do, Mr. Smith, we've got to do something about it." Well, you have an opportunity to do something about it right now. The police have investigated the case, we've prosecuted it the best we know how, and you're in the position of Harry Truman, who had on his desk a sign that said, "The buck stops here." The buck stops with you today. And you can do something about it. You can bring back the death penalty and you can tell William Brooks, and you can tell every other criminal like him, that if you come to Columbus and Muscogee County, and you commit a crime, and it's one of those crimes that's punishable by death, and if the aggravating circumstances are there, you're going to get the electric chair, that's what you can do. And, I believe that will stop some of the crime.

Now, I know it's going to be a hard decision, it's not easy, it's never easy. You can think about it this way when you get back there, you know from time to time if you were a surgeon, and you have people coming to you and maybe they have a cancer on their arm, and you look at it, and you say, "Well, the only way to save your life is to take your arm off," and that's bad to have to remove someone's arm. Or maybe he's got cancer of the eye, you have to take his eye out. Sure, that's terrible, but it's done because you save the rest of the body. And, I submit to you that William Brooks is a cancer on the body of society, and if we're going to save society and save civilization, then we've got to remove them from society.

And, you know, it's one thing that people who oppose capital punishment they can't dispute, if he's put to death, he'll never commit another crime, he'll never kill anybody else, never rape anybody else.

Now, we ask you, and you'll have written instructions going out with you, and in order to impose the death penalty, you must first find that while the murder was committed that he was engaged in certain other crimes, one is kidnapping, certainly he was engaged in that when he committed the murder, he carried her away from her home against her will. You recall that she had an appointment to eat breakfast, she had no idea she would be going anywhere other than to Shoney's.

The other thing is, he robbed her, committed an armed robbery, if you find that he committed the murder while he was engaged in either one or both of these two crimes that I've mentioned, the kidnapping or armed robbery, then you are authorized to impose the death penalty. And, let me talk to you about that a minute. Tuesday when we were examining you as prospective jurors, I asked each one of you the question, "Are you conscientiously opposed to the death penalty?" And every one of you on this jury said no, that you were not. I went one step further, and I asked you if you would consider the death penalty as one of the possible penalties, and would you vote for it if the facts and circumstances of this case authorized it, or warranted it. Of course, you didn't know what the facts and circumstances were at that time. But, each one of you said you would. And, we're asking you again to go back to the jury room and to deliberate, and to talk about the facts and circumstances of this case. Talk about how at eight-thirty in the morning she went out to the edge of the yard in broad open daylight, and how he was just walking along with a pistol in his pocket, and decided, "Well, I'll make a hustle," to use their language, his language. And then after he did that, "Well, I'll rape her," so he carried her down in the woods, and raped her, and shot her, and left her there bleeding to death. Those are the facts and circumstances we were talking about Tuesday, when we asked you if, under certain circumstances, you would vote for the death penalty.

I believe you'll vote for the death penalty. I want you to go out and discuss it, take all the time that you need, and we ask you to bring back a verdict on the punishment phase, and that he be put to death in the electric chair.

## ON PETITIONS FOR REHEARING

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON, and CLARK, Circuit Judges.

### PER CURIAM:

Footnote 40 of the opinion is hereby deleted. In the last sentence of the second paragraph of footnote 39, the words "a claim" are hereby deleted, and the words "an argument" are substituted in lieu thereof.[*]

IT IS ORDERED that the petitions for rehearing filed in the above-entitled and numbered cause be and the same are hereby DENIED.

CLARK, Circuit Judge, dissenting, with whom KRAVITCH and JOHNSON, Circuit Judges, join:

I dissent from the decision of the en banc court to deny rehearing in this case. The majority's use of the *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) prejudice test (which requires that the petitioner show that but for the improper argument the result of the proceeding would have been different) is in conflict with the recently decided Supreme Court case of *Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

In *Caldwell*, the Supreme Court in evaluating the impact of an improper argument used by the prosecutor at the penalty phase of Caldwell's trial concluded:

Because we cannot say that this effort [to minimize the jury's responsibility for determining the appropriateness of the death penalty] had *no effect on the sentencing decision*, that decision does not meet the standard of reliability that the Eighth Amendment requires.

—— U.S. at ——, 105 S.Ct. at 2646 (emphasis added).

The language used by the Supreme Court in *Caldwell* is, in essence, a paraphrase of the harmless error test used by the Court in numerous cases, most notably in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As I maintained in my special concurrence in this case, the harmless error test is incompatible with the *Strickland v. Washington* prejudice test, which shifts the burden of proof to the petitioner to demonstrate that but for the improper argument the result of the proceeding would have been different.

Furthermore, the prosecutor in this case made statements at the penalty phase indicating that he seldom sought the death penalty and then gave the factors he considered in deciding whether to seek the death penalty in a particular case. The majority of the en banc court was troubled

[*] These changes were incorporated in the opinion at p. 1407.

by this type of argument, i.e., the prosecutorial expertise argument. The root of the en banc majority's concern was identical to that espoused by the *Caldwell* majority, i.e., that the prosecutor's statement would lessen the jury's sense of responsibility for determining the appropriateness of the death penalty. Additionally, the majority recognized that the argument in this case had at least some prejudicial effect. The majority stated:

> Although we cannot conclude that these few improper arguments had no prejudicial effect on the jury, we are satisfied the prejudice was not severe.

*Brooks v. Kemp*, 762 F.2d 1383, 1415 (11th Cir.1985).

Therefore, the conclusion seems inescapable that our court's en banc opinion in this case conflicts with the Supreme Court's holding in *Caldwell v. Mississippi, supra.* The majority of our court found that the prosecutor's argument had some effect on the sentencing decision in Brooks' case. The Supreme Court in *Caldwell* held that the constitutional standard of reliability in the sentencing phase required another sentencing proceeding unless it was able to find that the prosecutor's argument had *no* effect upon the jury's decision. Consequently, I think we err when we do not reconsider our opinion in *Brooks* and I therefore dissent.